**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William T. MACK, Defendant–Appellant.**

No. 97–4039.

United States Court of Appeals, Sixth Circuit.

Submitted July 31, 1998.

Decided Oct. 15, 1998.

---

James H. Banks (briefed), Dublin, OH, for Appellant.

Raymond N. Hulser, Miles F. Ehrlich (briefed), U.S. Department of Justice Criminal Division, Public Integrity Section, Washington, DC, for Appellee.

Before: SUHRHEINRICH, DAUGHTREY, and GILMAN, Circuit Judges.

GILMAN, Circuit Judge.

William T. Mack was convicted by a jury on charges of committing mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively. The charges in question arose from a scheme to deprive the Ohio Department of Rehabilitation and Correction ("ODRC") and the citizens of Ohio of their right to Mack's honest services as Chief of Security of the Mansfield Correctional Institution ("MANCI") in Mansfield, Ohio. On appeal, Mack offers numerous grounds to vacate his convictions and prison sentence. For the reasons set forth below, we **AFFIRM** the convictions and prison sentence as set forth in the judgment of the district court.

## I. BACKGROUND

MANCI is a high-security facility that houses high-risk, violent offenders, including all of Ohio's male inmates on death row. Approximately 60 percent of the inmates imprisoned at MANCI were transferred there because of rules infractions committed at medium-security facilities.

Mack held the rank of Major with the ODRC and served as Chief of Security of MANCI from September of 1993 until February of 1995. As Chief of Security, Mack was the highest-ranking uniformed officer at MANCI, and was responsible for supervising and maintaining order and discipline among more than 400 uniformed officers of various ranks. He was also responsible for maintaining the security, safety, custody, and control of approximately 2,400 inmates imprisoned at MANCI. Under the ODRC's Standards of Employee Conduct ("SEC"), Mack was prohibited from using the power of his official position for personal advantage, from showing favoritism or providing preferential treatment to an inmate, or from becoming involved financially with an inmate without authorization. The SEC also prohibited Mack from offering or giving to an inmate any article, favor, or service "which is not authorized in the performance of the employee's duties and which appears to conflict with the employee's duties," or from accepting a gift from either an inmate or an inmate's family member or associate "which is not authorized in the performance of the employee's duties and which appears to conflict with the employee's duties."

### A. The Evidence at Trial

The evidence at trial showed that Mack developed a close relationship with James D. Crow, a MANCI inmate who had accumulated an extensive criminal history using approximately 28 different aliases. From 1982 through 1991, Crow was charged with or convicted of offenses in various parts of the United States, including cocaine possession in Texas, fraud in Georgia, wire fraud in

Indiana, and theft in Tennessee. Moreover, Crow was convicted in 1986 of escaping from a federal prison in Indiana.

Crow's experience with the Ohio prison system began when he was convicted in Montgomery County, Ohio of passing bad checks, and sentenced to a six-year term of imprisonment at the Dayton Correctional Institution, a medium-security facility. In April of 1993, however, prison authorities determined that Crow was not amenable to medium security, and upgraded his supervision classification accordingly. He was subsequently transferred to MANCI, where Mack was then serving as the unit manager of Crow's housing unit. The government introduced testimony that the unit managers at MANCI have routine contact with inmates in their unit and are expected to become familiar with them.

Between May and June of 1993, shortly after he had been transferred to MANCI, Crow committed insurance fraud. He was ultimately convicted of that offense and sentenced to serve an additional two years in prison.

The evidence at trial established that Mack and Crow developed an extensive business relationship. In particular, they executed the following written agreements: (1) a consulting agreement between Mack and J.D. Crow, Inc., an Ohio corporation headed by Crow, pursuant to which Mack received $10 per hour as compensation for unspecified services, (2) a pre-incorporation agreement to jointly form a corporation named Big "M" Trucking Co. (Mack and Crow subsequently amended this agreement to rename the corporation WTM Trucking Co.), (3) a pre-incorporation agreement to jointly form a corporation named Richland Gun Club, Inc., and (4) an agreement under which J.D. Crow, Inc. advanced $10,000 to Mack as an incentive for arranging to have the Richland Gun Club, Inc. and WTM Trucking Co. businesses fully operational within six to eight months. Under the latter agreement, Mack agreed to "devote a substantial portion of his daily schedule engaging in activities in furtherance of said business interests."

The evidence at trial also demonstrated that Mack signed each of the foregoing agreements. Moreover, he mailed incorporation documents and payments to the Office of the Secretary of State of Ohio for the purpose of establishing Richland Gun Club, Inc. and WTM Trucking Co. Dennis Baker, who served as the Warden of MANCI at the time of the events in question, testified that Mack never informed him of these agreements or businesses. Mack's financial involvement with Crow was therefore unauthorized.

The evidence at trial also established that Mack provided Crow with preferential treatment and special favors. In particular, Mack issued a letter to Alan D. Gables, Esq., Crow's attorney, expressing support for Gables's efforts to secure Crow's early release from MANCI before the Montgomery Court of Common Pleas. Notwithstanding Crow's extensive criminal history, as well as the conviction for insurance fraud that Crow incurred while an inmate at MANCI, Mack stated in the letter as follows:

> I have reviewed your client's file, and quite frankly I am amazed at the harshness of his sentence for merely writing six bad checks....
>
> Despite the seemingly unfair treatment that Mr. Crow has received from the justice system, he has not become bitter. Instead, since his arrival at our institution, Mr. Crow has been a model inmate.... Simply stated, it is my opinion that Mr. Crow is no longer a threat to society, if he ever was one in the first place.

Mack prepared the letter on official ODRC letterhead and signed it as Chief of Security of MANCI.

Mack also issued an interoffice communication directing "all concerned" to allow Crow "to come to the SECURITY/TIE Office as needed." Baker testified that such a document would give Crow "free rein" of MANCI.

Furthermore, Mack arranged on two occasions for Crow and Valerie Hamilton, Crow's girlfriend, to have unsupervised conjugal visits, which are strictly prohibited under Ohio law. The government introduced audio recordings of telephone conversations between Crow and Hamilton, in which they discuss having had sexual intercourse during

Hamilton's recent visit to MANCI. The government also presented an interoffice communication indicating that Mack personally escorted Hamilton for the second of her visits with Crow. Finally, the government elicited testimony from Crow indicating that Mack arranged for Crow and Hamilton to have conjugal visits in Mack's conference room. Crow testified that Mack left them unattended for approximately 30 to 35 minutes on both occasions.

The evidence at trial also established that Mack received an airline ticket and a bottle of scotch as gifts from Crow. The government introduced an audio recording of a telephone conversation between Crow and Hamilton, in which Crow directed Hamilton to purchase for "our friend" an airline ticket from Cleveland, Ohio to Sarasota, Florida. Crow stated at one point in the conversation, "[t]hat just assures us our quiet time, you know what I'm saying?" In another such conversation, Crow directed Hamilton to purchase a bottle of Ballantine's scotch.

Documentary and testimonial evidence established that Hamilton used a Visa credit card to purchase a $347 round-trip ticket in Mack's name for a USAir flight from Cleveland, Ohio to Sarasota, Florida, and that the ticket was generated using an interstate wire communication. The evidence also showed that Mack took the trip to Sarasota as scheduled using the ticket purchased by Hamilton. Agent Bruce Marshall, the case investigator for the government, testified that Mack admitted during an interview that Hamilton delivered to him a bottle of scotch and an airline ticket at a gas station near his home. Finally, Crow's testimony confirmed that Hamilton arranged to meet Mack at a gas station in order to give him the bottle of Ballantine's scotch and the airline ticket.

## B. The Indictment

In August of 1996, the government filed a three-count indictment charging Mack with committing mail fraud and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, respectively, by devising a scheme to deprive the ODRC and the citizens of Ohio of their intangible right to Mack's honest services as Chief of Security of MANCI. In so charging Mack, the government necessarily relied upon 18 U.S.C. § 1346, which provides that the term "scheme or artifice to defraud" within the meaning of §§ 1341 and 1343 "includes a scheme or artifice to deprive another of the intangible right of honest services." We note this court's recent holding that § 1346 was enacted to overrule *McNally v. United States*, 483 U.S. 350, 107 S.Ct. 2875, 97 L.Ed.2d 292 (1987) (construing § 1341 as limited in scope to the protection of property rights), and thus to "reinstate the doctrine of intangible rights to honest services," the classic application of which "has been to a corrupt public servant who has deprived the public of his honest services." *United States v. Frost*, 125 F.3d 346, 364–65 (6th Cir.1997).

According to the indictment, Mack's purpose in devising the scheme in question was to enrich himself by using his official position to obtain gifts, favors, and the prospect of long-term financial gain from Crow, and also to provide preferential treatment to Crow. Count one of the indictment, which charges Mack with committing wire fraud, arises from Mack's actions in causing a wire transmission between York Tours and Travel in Mansfield, Ohio and a facility in Charlotte, North Carolina in order to generate the aforementioned airline ticket. Counts two and three, which charge Mack with committing mail fraud, arise from Mack's actions in causing incorporation documents for WTM Trucking Co. and Richland Gun Club, Inc. to be delivered by United States mail to the Office of the Secretary of State of Ohio.

The matter proceeded to trial by jury on May 19, 1997. On May 29, 1997, the jury returned a verdict of guilty on all three counts of the indictment. The district court subsequently sentenced Mack to imprisonment for a total term of 18 months and entered judgment accordingly. On appeal, Mack offers numerous grounds to vacate his convictions and prison sentence as set forth in the judgment. We find each of the grounds to be without merit for the reasons that follow.

## II. ANALYSIS

### A. Challenges to the Convictions

#### 1. Admission of Statements under Rule 801(d)(2)(E)

Shortly before trial, Hamilton committed suicide. Mack subsequently brought a mo-

tion *in limine* seeking to preclude the government from introducing at trial any of Hamilton's statements as evidence against Mack. Mack argued in support of the motion that because Hamilton would not be testifying at trial, her statements constituted inadmissible hearsay. The government argued in opposition that those statements of Hamilton which it intended to introduce at trial were made "by a coconspirator ... during the course and in furtherance of the conspiracy," and thus were not hearsay pursuant to Rule 801(d)(2)(E) of the Federal Rules of Evidence. The district court denied Mack's motion *in limine*. On appeal, Mack challenges the district court's decision to permit the government to admit the audio recordings of telephone conversations between Crow and Hamilton.

Rule 801(d)(2)(E) provides that "[a] statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." This Rule applies if the district finds by a preponderance of the evidence "(1) that a conspiracy existed, (2) that the defendant was a member of the conspiracy and (3) that the co-conspirator's statements were made in furtherance of the conspiracy." *United States v. Pierce,* 62 F.3d 818, 827 (6th Cir.1995). These are factual determinations subject to the "clearly erroneous" standard of review. *United States v. Gessa,* 971 F.2d 1257, 1261 (6th Cir.1992) (en banc). A factual finding is clearly erroneous when, though there is evidence to support that finding, "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

In the present matter, the evidence at trial showed that Mack, on two occasions, arranged for Crow to have unsupervised conjugal visits with Hamilton in Mack's conference room. The evidence also showed that Crow directed Hamilton to secure for Mack a round-trip airline ticket and a bottle of scotch, both of which she delivered to him at a gas station near his home. If a conspiracy existed, then these statements of Hamilton, which directly related to the purchase of the airline ticket and the bottle of scotch, and to the conjugal visits with Crow, were properly admitted. Nevertheless, the question of whether Hamilton agreed to participate in Mack's scheme to deprive the ODRC and the citizens of Ohio of their intangible right to his honest services is a close one.

Although its Rule 801(d)(2)(E) determinations may be close calls, we are not left with the requisite *definite and firm* conviction that the district court committed an error in determining that Hamilton was involved in a conspiracy with Mack and that her statements in the recorded conversations were made in furtherance of that conspiracy. Accordingly, we affirm the district court's admission of those statements at trial.

Mack further argues that the district court erred by permitting the government to introduce excerpts of the recorded conversations between Crow and Hamilton as evidence against him, without allowing him to introduce further excerpts on his own behalf. We reject Mack's argument, however, because Rule 801(d)(2)(E) is limited to statements offered "against" a party. Accordingly, the district court properly refused Mack's request to introduce the pertinent excerpts on his own behalf.

Moreover, Mack did not argue below and does not argue on appeal that he was entitled to introduce the pertinent excerpts under the "rule of completeness" embodied in Fed. R.Evid. 106, which provides as follows:

> When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it.

Rather than attempt to introduce the pertinent excerpts at the time the government introduced them, Mack attempted to introduce those excerpts on cross-examination.

### 2. Concrete Business Harm

Mack contends on appeal that his convictions must be reversed because the government failed to prove that his conduct

caused "concrete business harm" to either MANCI or to the citizens of Ohio. In support of his position, Mack relies upon *United States v. Frost,* 125 F.3d 346 (6th Cir.1997), in which this court held that "an employee deprives his employer of honest services when 'the defendant might reasonably have contemplated some *concrete business harm* to his employer stemming from his failure to disclose the conflict along with any other information relevant to the transaction.'" *Id.* at 368 (quoting *United States v. Lemire,* 720 F.2d 1327, 1337 (D.C.Cir.1983)) (emphasis added).

In formulating the above standard, however, the *Frost* court emphasized that "we are not reviewing the standard applicable to defendants accused of depriving the public of the honest services of public officials." *Id.* at 369. Because Mack was charged as a public official with depriving MANCI and the citizens of Ohio of their intangible right to his honest services, we reject his contention that the government was required under *Frost* to prove that his conduct caused "concrete business harm."

### 3. Sufficiency of the Evidence

■ Mack challenges the sufficiency of the evidence offered by the government in support of his convictions. Mack initially made this challenge in a motion for judgment of acquittal brought under Rule 29(a) of the Federal Rules of Criminal Procedure at the close of the government's case-in-chief. The district court denied Mack's motion, determining that the government had presented sufficient evidence to establish the essential elements of the charges against him. He did not renew his Rule 29(a) motion after the close of all of the evidence.

■ "Absent a showing of a manifest miscarriage of justice, this court will not review a district court denial of a Rule 29 motion where a defendant does not renew that motion at the close of all the evidence." *United States v. Williams,* 940 F.2d 176, 180 (6th Cir.1991). In this context, "[a] 'miscarriage of justice' exists only if the record is 'devoid of evidence pointing to guilt.'" *United States v. Price,* 134 F.3d 340, 350 (6th Cir.1998) (quoting *United States v. Robles–Pantoja,* 887 F.2d 1250, 1254 (5th Cir.1989)).

In the present matter, the government introduced overwhelming evidence against Mack in the form of testimony, documents, and audio recordings. Accordingly, we are satisfied that the district court's denial of Mack's Rule 29 motion did not rise to the level of "a manifest miscarriage of justice." *Williams,* 940 F.2d at 180. We will not, therefore, disturb the district court's ruling with respect to the sufficiency of the evidence in light of Mack's failure to renew his Rule 29 motion.

### 4. Evidence of Convictions and Guilty Pleas

■ Mack asserts that the district court erred by allowing the government to introduce evidence of convictions and guilty pleas of various individuals. The purpose of such evidence, however, was to challenge the credibility of certain witnesses or to respond to Mack's arguments that he was being unfairly singled out for criminal prosecution (while others received only administrative punishment), and that he was being prosecuted in retaliation for filing an action for employment discrimination against MANCI.

The government did not imply that the guilty pleas of others were relevant to Mack's guilt or innocence, and the district court instructed the jury accordingly. Indeed, Mack concedes that the charges giving rise to the guilty pleas were "completely unrelated" to the charges against Mack. Accordingly, we reject Mack's argument that the district court erred in allowing evidence of these convictions and guilty pleas at trial.

### 5. Fifth Amendment Privilege

■ The first witness called by the defense was Frank Sawyer, a member of the Ohio House of Representatives at the time of the events in question. Mack called Sawyer for the purpose of eliciting testimony supporting Mack's theory that numerous community leaders, including Sawyer, were manipulated by Crow into sending letters or rendering other assistance in connection with Crow's efforts to obtain either clemency or early release from MANCI. Moreover, the

defense intended to elicit testimony supporting its theory that Mack provided preferential treatment to Crow solely because he felt pressured to do so in light of Crow's close relationship with Sawyer and other influential community leaders.

When Sawyer appeared at trial without[a] counsel, the district court advised Sawyer of his Fifth Amendment privilege to refuse to answer questions that may incriminate him, and encouraged him to confer with counsel before taking the stand. Sawyer then contacted an attorney, who arrived at the proceedings shortly thereafter.

In order to inform Sawyer and his counsel of the issues surrounding his prospective testimony, the district court convened an on-the-record session *in camera*. At that time, the prosecutor explained to Sawyer that he was the subject of an ongoing investigation concerning his relationship with Crow. In particular, Sawyer was informed that the government had gathered evidence indicating that he had submitted false documents in support of Crow's petition for clemency, had committed bank fraud, and had possessed controlled substances.

After conferring with counsel, Sawyer decided to assert his Fifth Amendment privilege if compelled to take the stand. When the court then permitted Mack to call Sawyer as a witness, Sawyer proceeded to answer questions regarding his name and place of residence, and thereafter responded to each question by invoking his Fifth Amendment privilege. When Sawyer stepped down, the district court instructed the members of the jury that they "may not to infer anything, either positive or negative, on behalf of the government or on behalf of the defendant." Mack argues on appeal that the district court erred in permitting Sawyer to invoke his Fifth Amendment privilege.

■■■■■ A defendant's right to compel a witness to testify must yield to that witness's assertion of his or her Fifth Amendment privilege against self-incrimination when that assertion is grounded upon a reasonable fear of prosecution. *United States v. Gaitan–Acevedo*, 148 F.3d 577, 588 (6th Cir.1998). The district court is necessarily accorded broad discretion in determining whether an invoked Fifth Amendment privilege is meritorious. *Id.* Because we review for an abuse of discretion, the district court's ruling will be affirmed unless we are left with a "definite and firm conviction that the trial court committed a clear error of judgment." *Logan v. Dayton Hudson Corp.*, 865 F.2d 789, 790 (6th Cir.1989).

In the present matter, Sawyer learned before testifying that he was a subject in an ongoing investigation that implicated his relationship with Crow. Moreover, he learned that the government had gathered incriminating evidence against him. Under these circumstances, we are satisfied that Sawyer had a reasonable basis to be in fear of prosecution. Accordingly, we are not left with a definite and firm conviction that the district court committed a clear error of judgment in permitting Sawyer to invoke his Fifth Amendment privilege.

### 6. Instruction on Mail Fraud and Wire Fraud

■■■■ In charging the jury, the district court included the following instruction regarding the "mailing" element necessary to establish a violation of § 1341:

> The government must prove beyond a reasonable doubt ... that the mails were used in some manner to carry out the scheme to defraud, that use of the mails was *incident to* an essential part of this scheme, and that it was reasonably foreseeable to the defendant or would follow in the ordinary course of business or events that the mails would be used.

(Emphasis added.) The district court also used the "incident to" language in connection with the essential elements of a wire-fraud violation under § 1343.

Although Mack did not offer a definition of the phrase "incident to" at trial, he contends on appeal that the district court erred in not providing such a definition. The thrust of Mack's argument is that without an appropriate definition of "incident to," the jury could have concluded that even the most insignificant or trivial conduct satisfied the standard to convict for mail fraud or wire fraud. Because the instruction was a correct statement

of the law, and the jury needed no special knowledge to understand the phrase "incident to," we find Mack's argument unpersuasive.

In *Schmuck v. United States*, 489 U.S. 705, 109 S.Ct. 1443, 103 L.Ed.2d 734 (1989), the Supreme Court affirmed a conviction for mail fraud under § 1341, holding that "the use of the mails need not be an essential element of the scheme." *Id.* at 710, 109 S.Ct. 1443. Rather, "[i]t is sufficient for the mailing to be 'incident to an essential part of the scheme....'" *Id.* at 710–11, 109 S.Ct. 1443 (quoting *Badders v. United States*, 240 U.S. 391, 394, 36 S.Ct. 367, 60 L.Ed. 706 (1916)). This court recently reiterated that standard in *Frost.* 125 F.3d at 359 ("Although the use of the mails does not have to be an essential part of the scheme, it does have to be incident to an essential part of the scheme."). We thus find that the instruction, which precisely employed the language set forth in the above precedents, was a correct statement of law.

Furthermore, we are satisfied that the district court was not required to include a definition of "incident to" in its instructions. A district court need not define familiar English words when the jury can appreciate their meaning without special knowledge. *See U.S. v. Dugan*, 150 F.3d 865, 867 (8th Cir.1998) (rejecting the defendant's contention that the court should have defined the words "agent" and "network" for the jury in connection with the defendant's charges under the mail-fraud and wire-fraud statutes (§§ 1341 and 1343)). Similarly, we find that the words "incident to" require no definition.

### 7. Proposed "Defense Theory" Instruction

Mack did not take the stand to testify on his own behalf at trial. He did, however, offer the following proposed jury instruction:

#### DEFENSE THEORY

. . . .

The defendant denies the charges contained in the indictment. He says that he was not part of an illegal scheme of any kind, nor did he have knowledge that any scheme existed.

He further says that he merely trusted (albeit mistakenly), an inmate who was expected to be released in the immediate future and who had the backing of public officials, including but not limited to judges, State representatives, attorneys, elected officials and others throughout the State of Ohio.

Mack contends on appeal that the district court erred in refusing to incorporate his proposed instruction in its charge to the jury.

We review jury instructions as a whole to determine whether they fairly and adequately submitted the issues and applicable law to the jury. *See United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir.1991). The refusal of a district court to use language requested by a party is not error "if the instruction as given is accurate and sufficient." *United States v. Horton*, 847 F.2d 313, 322 (6th Cir.1988). Rather, a district court's refusal to deliver a requested instruction is reversible only if that instruction is "(1) a correct statement of the law, (2) not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *Williams*, 952 F.2d at 1512.

We are satisfied that the district court did not err in refusing to deliver the "defense theory" instruction proposed by Mack. In arriving at that conclusion, we simply note that the proposed instruction does not constitute a statement of law. Rather, it is a categorical denial of the charges contained in the indictment and, if adopted, would have resulted in the district court informing the jury of what Mack would have stated if he had testified on his own behalf. The district court, therefore, properly refused to adopt the proposed instruction.

### 8. Verdict by Eleven Jurors

On May 28, 1997, after charging the jury, the district court released the twelve jurors to conduct their deliberations. In so doing, the district court dismissed the two

alternate jurors. On the following morning, the district court learned that one of the twelve jurors had been taken to the hospital for emergency surgery, and was expected to remain hospitalized for a substantial period of time.

The district court, over Mack's objection, instructed the remaining eleven jurors to renew their deliberations and return a verdict accordingly. With respect to the alternate jurors, the district court stated as follows:

> I have already released the alternates and I do not believe I have the option of calling them back at this time since they have been released from their limitations about discussing this matter with other people and released from any limitations that were placed on them regarding paying attention to the press or doing any analysis about the case.

Later that day, the jury returned verdicts of guilty on all three counts of the indictment.

Mack asserts on appeal that the district court erred by directing the remaining eleven jurors to renew their deliberations and return a verdict. He argues that the district court should have recalled one of the two alternate jurors who had been dismissed the previous day. Mack also argues that the district court should have granted a mistrial because the incapacitated juror was African–American, as is Mack.

■ Rule 23(b) of the Federal Rules of Criminal Procedure provides in relevant part as follows:

> [I]f the court finds it necessary to excuse a juror for just cause after the jury has retired to consider its verdict, in the discretion of the court a valid verdict may be returned by the 11 remaining jurors.

We review for an abuse of discretion a district court's decision under Rule 23(b) to direct an eleven-member jury to deliberate to a verdict. *United States v. Glover,* 21 F.3d 133, 135 (6th Cir.1994).

In the present matter, the district court was confronted with the unexpected loss of a juror after having released the alternate jurors the previous day. Under these circumstances, the district court exercised its authority to proceed with eleven jurors as expressly contemplated by Rule 23(b). Although recalling an alternate juror may have obviated Mack's challenge on this issue, the district court's refusal to do so does not leave us with a definite and firm conviction that a clear error of judgment was committed. *See Logan,* 865 F.2d at 790. Accordingly, we are satisfied that district court did not abuse its discretion in directing the remaining eleven jurors to deliberate to a verdict.

■ Moreover, we reject Mack's contention that the district court erred by proceeding under Rule 29(b) despite the last-minute loss of a juror of his own race. It is well-established that a criminal defendant has no affirmative right to a jury with a particular racial composition. *See, e.g., Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975).

## B. Challenges to the Prison Sentence

The Presentence Investigation Report ("PIR") prepared by the United States Probation Office in connection with Mack's convictions calculated a Total Offense Level of 18 and a Criminal History Category of I, resulting in an imprisonment range of 27 to 33 months. The PIR arrived at the foregoing Total Offense Level using a Base Offense Level of 10 under USSG § 2C1.7, and then enhancing that figure by eight levels under USSG § 2C1.7(b)(1)(B) (directing that "[i]f the offense involved an elected official or any official holding a high-level decision-making or sensitive position, increase by 8 levels.").

The district court ultimately adopted the PIR's Base Offense Level determination and application of an eight-level § 2C1.7(b)(1)(B) enhancement. The district court, however, granted a five-level reduction under USSG § 5K2.0, which authorizes the imposition of "a sentence outside the range established by the applicable guideline, if the court finds 'that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines that should result in a sentence different from that described.'" (quot-

ing 18 U.S.C. § 3553(b)). Accordingly, the district court employed a Total Offense Level of 13 with a Criminal History Category of I, resulting in an imprisonment range of 12 to 18 months. Mack ultimately received a sentence of imprisonment for a total term of 18 months.

### 1. Determination of Mack's Base Offense Level

 Mack contends that the district court erroneously determined his Base Offense Level under USSG § 2C1.7, rather than USSG § 2C1.2. In support of his position, Mack notes that either § 2C1.7 or § 2C1.2 may be applied to convictions for mail fraud or wire fraud under § 1341 and § 1343, respectively. *See* USSG App. A. Section 2C1.7 pertains to "Fraud Involving Deprivation of the Intangible Right to the Honest Services of Public Officials," which is precisely the basis of Mack's convictions under §§ 1341 and 1343 in the present case. Mack nevertheless contends that § 2C1.2, the section pertaining to "Offering, Giving, Soliciting, or Receiving a Gratuity[,]" is more applicable.

While Mack did solicit and receive gratuities from Crow, *i.e.*, a plane ticket and a bottle of scotch, the evidence at trial also demonstrated that Mack had an extensive business relationship with Crow, performed personal favors for Crow, and provided him with preferential treatment. In the process, Mack violated several provisions of the SEC for long-term financial gain, thereby depriving the ODRC and the citizens of Ohio their right to Mack's honest services as MANCI's Chief of Security. Under these circumstances, we are satisfied that the district court properly applied § 2C1.7 in determining Mack's Base Offense Level.

### 2. The Eight–Level 2C1.7(b)(1)(B) Enhancement

 Mack contends that the district court erroneously enhanced his Base Offense Level under § 2C1.7(b)(1)(B), which provides that "[i]f the offense involved an elected official or any official holding a high-level decision-making or sensitive position, increase by 8 levels." Whether an individual constitutes

an "official holding a high level decision-making or sensitive position" within the meaning of § 2C1.7(b)(1)(B) is a factual determination subject to review under the "clearly erroneous" standard. *United States v. ReBrook*, 58 F.3d 961, 969 (4th Cir.1995).

In determining whether the district court erred in applying the § 2C1.7(b)(1)(B) enhancement, we refer to USSG § 2C1.7, comment. (n. 2), which provides as follows:

> "Official holding a high-level decision-making or sensitive position" includes, for example, prosecuting attorneys, judges, agency administrators, *supervisory law enforcement officers*, and other governmental officials with similar levels of responsibility.

(Emphasis added.) As a Major and Chief of Security of MANCI, Mack was the highest-ranking uniformed officer employed at MANCI. In that capacity, he was responsible for supervising and maintaining order and discipline among more than 400 uniformed officers of various ranks. Under these circumstances, we are satisfied that the district court had a solid foundation upon which to conclude that Mack was a "supervisory law-enforcement officer" within the meaning of § 2C1.7, comment. (n. 2). We are not, therefore, left with a definite and firm conviction that the district court committed an error by finding Mack to be an "official holding a high level decision-making or sensitive position" within the meaning of § 2C1.7(b)(1)(B), and applying the eight-level enhancement accordingly.

### 3. Reduction for Acceptance of Responsibility under § 3E1.1(a)

 Finally, Mack contends that the district court erroneously refused to reduce his Base Offense Level by two levels under § 3E1.1(a), which applies to a defendant who "clearly demonstrates acceptance of responsibility for his offense...." Whether an individual clearly demonstrates such acceptance within the meaning of § 3E1.1(a) is also a factual determination subject to review under the "clearly erroneous" standard. *United States v. Benjamin*, 138 F.3d 1069, 1075 (6th Cir.1998).

In determining whether the district court erred in refusing to apply the § 3E1.1(a)

reduction, we refer to USSG § 3E1.1, comment. (n.2), which provides as follows:

> This adjustment is not intended to apply to a defendant who puts the government to its burden of proof at trial by denying the essential factual elements of guilt, is convicted, and only then admits guilt and expresses remorse. Conviction by trial, however, does not automatically preclude a defendant from consideration for such a reduction. In rare situations a defendant may clearly demonstrate an acceptance of responsibility for his criminal conduct even though he exercises his constitutional right to a trial. This may occur, for example, where a defendant goes to trial to assert and preserve issues that do not relate to factual guilt (*e.g.*, to make a constitutional challenge to a statute or a challenge to the applicability of a statute to his conduct). In each such instance, however, a determination that a defendant has accepted responsibility will be based primarily upon pre-trial statements and conduct.

■ In light of the foregoing, we recognize that Mack is not automatically precluded from eligibility for a § 3E1.1(a) reduction by virtue of the fact that the present matter was tried to conclusion. Nevertheless, there is virtually no indication that Mack "clearly demonstrated acceptance of responsibility" for his offenses during any phase of the proceedings below. Indeed, Mack's proposed "defense theory" instruction, which provides "that he was not part of an illegal scheme of any kind, nor did he have knowledge that any scheme existed[,]" amounted to an outright denial of culpability. Under these circumstances, we are not left with a definite and firm conviction that the district court committed an error by finding that Mack did not clearly demonstrate acceptance of responsibility within the meaning of § 3E1.1(a).

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM** Mack's convictions and prison sentence as set forth in the judgment of the district court.