**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Andrew L. THOMAS and Anthony Mykael Bond, Defendants–Appellants.**

**Nos. 99–5318, 99–5345.**

United States Court of Appeals,
Sixth Circuit.

Jan. 31, 2002.

Before MARTIN, Chief Judge; SUHRHEINRICH, Circuit Judge; and OLIVER,* District Judge.

PER CURIAM.

Defendant–Appellant Andrew L. Thomas ("Thomas") appeals his conviction on: (1) one count of interfering with commerce by threat or violence in violation of 18 U.S.C. § 1951; (2) one count of using or carrying a firearm during the commission of a crime of violence in violation of 18 U.S.C. § 924(c); and (3) one count of being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g). Thomas raises the following issues on appeal: (1) that the district court and the prosecutor improperly vouched for the government's main witness; (2) that the court violated his Sixth Amendment right to compulsory process when it failed to compel the testimony of certain witnesses; (3) that the court improperly permitted certain witnesses to invoke their Fifth Amendment privilege; and (4) that the court improperly refused to allow Thomas to recall a surrebuttal witness.

Co–Defendant and Appellant Anthony Mykael Bond ("Bond") appeals his sen-

* The Honorable Solomon Oliver, Jr., United States District Judge for the Northern District of Ohio, sitting by designation.

tence on one count of interfering with commerce by threat or violence pursuant to 18 U.S.C. § 1951. Bond claims that the district court abused its discretion when it enhanced his sentence under U.S. Sentencing Guidelines Manual ("U.S.S.G.") § 5K2.2. For the reasons set forth below, we AFFIRM Thomas' conviction and Bond's sentence.

## I. BACKGROUND

On or about April 21, 1997, James Day, a courier for the Loomis–Fargo armored car company, was shot in the back of the head as he exited a Walgreens store in Memphis, Tennessee, after making a pickup. After shooting Mr. Day, Thomas grabbed the bag of money and checks that Mr. Day had been carrying and fled in a stolen getaway car driven by Bond.

Thomas and Bond then drove to a nearby street where they had left a small, red, two-door Suzuki, owned by Thomas' then girlfriend, Angela Jackson ("Jackson"). After abandoning the stolen getaway car, Thomas and Bond proceeded to flee in the Suzuki. They drove to Jackson's apartment, where they counted the stolen money and divided it up. Thomas instructed Bond to get rid of the gun used in the shooting. Thereafter, Bond left Jackson's apartment.

In the fall of 1997, Bond was arrested in Memphis on unrelated state charges. After his arrest, the police found Bond's fingerprint on the stolen getaway car and Bond subsequently admitted his and Thomas' involvement in the Loomis–Fargo robbery. FBI agents questioned Angela Jackson, who had by then separated from Thomas, and obtained a statement from her.

On June 15, 1998, the Federal Grand Jury for the Western District of Tennessee returned a three-count indictment against Thomas and Bond: Count 1 of the Indict-

ment charged both defendants with robbery affecting commerce, in violation of 18 U.S.C. § 1951; Count 2 charged both defendants with using and carrying a firearm during and in relation to a crime of violence, in violation of 18 U.S.C. § 924(c); and Count 3 charged Thomas with being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g).

On November 4, 1998, Anthony Bond pled guilty, pursuant to a plea agreement, to Count 1 of the Indictment. On March 1, 1999, the district court sentenced Bond to 12 years incarceration.

Andrew Thomas' case was tried before a jury on November 5, 6, 9, 10, 12 and 13, 1998. On November 13, 1998, the jury returned a verdict of guilty against Thomas on all three counts of the Indictment. Thomas was sentenced to life in prison plus 5 years.

These appeals were consolidated by order of this Court on July 7, 1999.

## II. ANALYSIS

A. Neither The Government Nor The District Court Engaged In Improper Vouching For Bond During Closing Argument

The first question raised on appeal by Thomas is whether the government improperly vouched for the credibility of Bond, the co-defendant and witness for the prosecution in Thomas' trial, during its closing argument. Whether the prosecutor engaged in improper vouching in this case is a mixed question of law and fact and is therefore reviewed *de novo*. *United States v. Francis*, 170 F.3d 546, 549 (6th Cir.1999); *United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993).

"Improper vouching occurs when a prosecutor supports the credibility of a witness by indicating a personal belief in the wit-

ness's credibility thereby placing the prestige of the office of the United States Attorney behind that witness." *Francis*, 170 F.3d at 550. "Generally, improper vouching involves either blunt comments," such as "I think he [the witness] was candid." "I think he was honest.", or "comments that imply that the prosecutor has special knowledge of facts not in front of the jury or of the credibility and truthfulness of witnesses and their testimony." *Id.* For example, blatantly implying that a plea agreement ensures that a witness is truthful or implying that the government was satisfied that the witness was truthful constitutes improper vouching. *United States v. Carroll*, 26 F.3d 1380, 1389 (6th Cir.1994). However, a prosecutor may refer to the plea agreement of a testifying witness, elicit its terms, and use it in an attempt to deflect defense counsel's use of the agreement to attack the witness's credibility. *Francis*, 170 F.3d at 550.

■ In his closing argument, Thomas' counsel sought to attack Bond's credibility by arguing that the plea agreement gave Bond an incentive to lie:

> He's looking at a lot of time. He's looking at other charges by his own admission, and he makes a deal with the United States government to sell somebody down the river so they will agree not to prosecute him federally for any charges in state court. And so they'll drop a count against him from this case and in this court and so he will have a further chance from the sentencing judge of getting his sentence reduced even further.
>
> Mr. Arvin [Assistant United States Attorney] still wants you to believe [Bond's] testimony is credible, and that he has no motive to lie. He's got every motive to lie. He doesn't come in here and sink this man, he loses his deal. That's as big a motive as you can get.

MR. ARVIN: Objection

THE COURT: Objection sustained. That's not the agreement.

MR. IRBY: The agreement is that he must testify truthfully. Ladies and gentlemen, he had to make the deal that he made to even have a chance to get his time reduced in this case ....for them to say they have no motive to do what they did, against this man, that's a lie.

\* \* \* \* \* \*

Joint Appendix ("J.A.") at 498. In rebuttal, the government countered that the plea agreement gave Bond a motive to tell the truth:

> Oh, yeah, this. Think about this. Why would Anthony Bond, the scoundrel that he is, why would he pick out Andrew Thomas if it really wasn't Andrew Thomas? Why not just say who really did it? Why not just say that? Wouldn't that be the easiest thing? Just say it was somebody else. Don't lose your plea agreement. You may lose your plea agreement if you do not tell the truth. Why would he pick out Anthony Bond?

J.A. at 499.

In order to determine whether prosecutorial vouching constitutes reversible constitutional error, this Court must apply a two-step analysis: First, we must assess whether the statements were improper, and second, if such statements were improper, whether the impropriety was harmless. *United States v. Carroll*, 26 F.3d 1380, 1387–88 (6th Cir.1994).

In *United States v. Krebs*, 788 F.2d 1166, 1176 (6th Cir.), *cert. denied*, 479 U.S. 930, 107 S.Ct. 400, 93 L.Ed.2d 353 (1986), the prosecutor made the following statements in her closing argument: "I want to suggest to you that in this trial testimony [the witness] was telling the truth....

Basically, she had no reason to lie." Even though we recognized that "I suggest" or "I submit" is not equivalent to "I believe," we found that "the effect of the two statements taken together can be reasonably construed to be based on personal belief." *Krebs*, 788 F.2d at 1176–77 (citations omitted). We not only found that this constituted misconduct calling for the trial court to take corrective measures, but we also characterized the prosecutor's conduct as "inexcusable." *Id.* at 1177; *Carroll* at 1387.

Similarly, in *United States v. Dandy*, 998 F.2d 1344, 1353 (6th Cir.1993), we held: "It was improper for the prosecutor to state [in his closing argument] that [a witness] is honest. Such a statement conveys a conviction of personal belief regarding the witness's veracity." *See also United States v. Hart*, 640 F.2d 856, 858–59 (6th Cir.) (holding that various expressions of personal belief by the prosecutor in closing argument were improper, warranting admonishment by the trial court), *cert. denied*, 451 U.S. 992, 101 S.Ct. 2334, 68 L.Ed.2d 853 (1981).

We conclude that there was no improper vouching in this case. The prosecutor made no statement regarding his personal belief in the veracity of the witness. Rather, in response to defense counsel's assertion that Bond had a motive to testify falsely, the prosecutor pointed out that he also had a motive to tell the truth. There is no indication that the prosecutor was putting the full weight of his office behind the credibility of this witness. The prosecutor simply countered defense counsel's closing argument suggesting that Bond was willing to lie at Thomas' expense to achieve a sentence reduction. Unlike the prosecutor in *Carroll*, the government in this case made no statements implying that it personally believed Bond's testimony, or that it would make a U.S.S.G.

§ 5K1.1 motion at his sentencing. *See, e.g., Carroll*, 26 F.3d at 1387.

Indeed, this case is similar to *United States v. Renteria*, 106 F.3d 765 (7th Cir. 1997), wherein the court held that the following comments by the prosecutor in rebuttal were not improper:

Do they have an incentive to testify? Cooperate? Yes. Do they have incentive to tell the truth? Well, what's their incentive to tell the truth now? If they lie, they lose that deal. They have more incentive to tell the truth now than anyone else did because if they lie, they don't get any deal. They've blown it all.

*Id.* at 766. In rejecting the argument that the prosecutor's statements constituted improper vouching because they implied that the plea agreements provided witnesses an incentive to testify truthfully, the Seventh Circuit concluded:

The plea agreements were in evidence, and the prosecutor was free to invite the jury to draw a particular inference from this evidence.... Defense counsel was free to urge a competing inference, as he did on numerous occasions. By arguing as they did, both sides respected the jury's ability to evaluate credibility based on the facts in evidence. There was no vouching.

*Renteria*, 106 F.3d. at 767. We conclude, based on the foregoing, that Thomas has failed to show that the prosecutor's comments at trial were improper.

■ However, even assuming, *arguendo*, that the prosecutor's statements were improper, we find the error to have been harmless. To reverse a conviction because of non-flagrant improper statements, the court must determine: (1) that the proof of defendant's guilt was not overwhelming; (2) defense counsel objected; and (3) the trial court failed to cure the impropriety by failing to admonish the jury. *United States v. Monus*, 128 F.3d 376, 394 (6th

Cir.1997). In this case, there was overwhelming proof of Thomas' guilt, namely: a.) the testimony of his accomplice and co-defendant; b.) the testimony of his girlfriend that she witnessed him with the proceeds of the robbery and heard him brag about his involvement; c.) substantial corroborating evidence, including the videotape of the robbery; and d.) the testimony which contradicted his purported alibi. Moreover, since defense counsel made no objection to the statements at trial, the trial court had no reason to admonish the jury. Accordingly, any possible error in this case was harmless.

▐ Thomas also argues that the district court improperly vouched for the credibility of Bond when it sustained an objection made by the government during the defense's closing argument. During the defense's closing argument, the following took place:

> Mr. Arvin still wants you to believe [Bond's] testimony is credible, and that he has no motive to lie. He's got every motive to lie. He doesn't come in here and sink this man, he loses his deal. That's as big a motive as you can get.
>
> MR. ARVIN: Objection
>
> THE COURT: Objection sustained. That's not the agreement.
>
> MR. IRBY: The agreement is that he must testify truthfully. Ladies and gentlemen, he had to make the deal that he made to even have a chance to get his time reduced in this case.

J.A. at 498. Thomas argues that the district court, by sustaining the government's objection, essentially told the jury that the government's argument was the correct argument, inasmuch as the government contended that the plea agreement supported the witness's credibility. We disagree.

It is improper for a party to misstate the evidence in closing argument. *United States v. Carter*, 236 F.3d 777, 784 (6th Cir.2001) (while counsel has the freedom at trial to argue reasonable inferences from the evidence, counsel cannot misstate evidence) (citing *United States v. Young*, 470 U.S. 1, 9 & n. 7, 105, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). The plea agreement did not provide that Bond had to name any particular person or that any particular person had to be convicted. It provided only that Bond had to testify truthfully. Furthermore, the court's statement, "That's not the agreement" did not constitute vouching. The court did not imply that Bond had testified truthfully, or that he was otherwise a credible witness. The court merely said that defense counsel had misstated the content of the plea agreement. We find no error on this ground.

**B. The District Court Did Not Violate Thomas' Right To Compulsory Process**

▐ Thomas next raises the issue of whether the district court violated his Sixth Amendment right to compulsory process by failing to compel the attendance of witnesses that he sought in an effort to impeach the testimony of Angela Jackson.

The court's decision whether to grant or deny a motion for a continuance in order to secure the attendance of a witness is reviewed for abuse of discretion. *United States v. Peters*, 15 F.3d 540, 545 (6th Cir.), *cert. denied*, 513 U.S. 883, 115 S.Ct. 219, 130 L.Ed.2d 146 (1994). Denial of a motion for continuance will only be found to be an abuse of discretion when the court exhibits "an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for a delay." *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983). Prejudice requires a showing that a continuance would have made a relevant witness avail-

able or added something to the defense. *United States v. Wirsing,* 719 F.2d 859, (6th Cir.1983).

Angela Jackson, Thomas' girlfriend at the time of the robberies, testified that Thomas made incriminating statements about the robbery while they were watching television at a motel on the night of the robbery. According to her testimony, she and Thomas spent the night at a motel "down by Stateline Road." Thomas sought to impeach Jackson's testimony at trial by showing that no persons named "Andrew Thomas" or "Angela Jackson" registered a room on the night of the robbery at any motels in that area. Thomas served subpoenas on employees of four motels on or just off of Stateline Road in Southhaven, Mississippi. Two hotels responded and had employees who testified that no one had registered under the name of either the defendant or Angela Jackson on the night in question. At trial, defense counsel advised the court other hotel employees were under subpoena and that they would also testify that no such person had registered at their facilities on the night at issue. Thomas claims that the court's refusal to allow him additional time to secure this testimony violated his Sixth Amendment right to compulsory process.

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to have compulsory process for obtaining witnesses in his favor...." The clause thus provides a defendant with the right to present witnesses and evidence in his defense. *United States v. Hamilton,* 128 F.3d 996, 1000 (6th Cir.1997) (citing *Washington v. Texas,* 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967)).

In *Bennett v. Scroggy,* 793 F.2d 772 (6th Cir.1986), we cited the following factors as being among those which appellate courts should consider in determining whether a trial court's denial of an actual motion for a continuance has deprived a defendant of his right to compulsory process:

the diligence of the defense in interviewing witnesses and procuring their presence, the probability of procuring their testimony within a reasonable time, the specificity with which the defense is able to describe their expected knowledge or testimony, the degree to which such testimony is expected to be favorable to the accused, and the unique or cumulative nature of the testimony.

*Id.* at 774 (citations omitted). We conclude that the district court did not abuse its discretion in refusing to grant a continuance. Thomas' counsel failed to timely serve subpoenas on the witnesses he sought to call. Angela Jackson testified about the motel on the morning of Tuesday, November 10, 1998. Defense counsel did not attempt to serve his motel witnesses until the night of November 11, 1998, and indeed, failed to actually serve two of the witnesses. Moreover, the district court determined that the relevance of this testimony would be marginal, inasmuch as it was speculation that either Thomas or Jackson would have used their real names when registering that night. We also note that the district court allowed Thomas several delays in the trial to permit him to locate certain other of his witnesses, and in fact allowed Thomas to reopen his proof to put on one of his witnesses. J.A. at 405–408, 434–438. Finally, Thomas' counsel never requested the district court's assistance in compelling the attendance of these witnesses. Based on the foregoing, we cannot conclude that the district court abused its discretion in denying Thomas' motion for a continuance.

C. The District Court Properly Permitted Witnesses Called By Thomas To Refuse To Testify Based On Their Fifth Amendment Privilege

Thomas next claims that the district court abused its discretion in permit-

ting several witnesses that he called to invoke their Fifth Amendment right to refuse to testify. Thomas attempted to secure the testimony of four witnesses at his trial, all of whom were incarcerated and facing pending state charges. According to Thomas, these individuals could testify that it was Bond, and not Thomas, who shot James Day, and that at least one individual would say that it was someone else, and not Thomas, who participated in the robbery. The district court allowed all four witnesses to assert a Fifth Amendment privilege.

The four individuals that Thomas sought to call as witnesses were Keith Echols, Travis Brown, Sharod Rogers and Willie Cooper. After the April 1997 Loomis–Fargo robbery, both Thomas and Bond had joined Echols, Brown and Rogers in a series of other robberies, with various combinations of the five taking part. By the fall of 1997, Thomas, Bond, Echols, Brown and Rogers had all been arrested for these robberies and were incarcerated facing pending state law charges as a result. While confined on these charges, Echols told the authorities that Thomas and Bond had committed the Loomis–Fargo robbery, and that Bond had bragged about being the trigger man. Willie Cooper also made similar statements related to the Loomis–Fargo robbery. He told police that he had overheard Bond saying that Bond and Thomas did the Loomis–Fargo robbery, but that it was Bond who was the trigger man. Like the others, Cooper was facing state charges; however these charges were not connected to Thomas, Bond, Echols, Brown or Rogers.

Defense counsel sought to call these witnesses to impeach Bond's testimony that it was Thomas who was the shooter in the robbery. The court first had Sharod Rogers called into court outside the presence of the jury. After ascertaining that Rog-

ers intended to invoke his Fifth Amendment privilege, the court announced its intent to have the jury brought back in so that Rogers could take the Fifth on the stand and in the presence of the jury. Thomas' counsel, at that point, informed the court that "... I don't think we'll put this gentleman on the stand ... I don't think we want to put any one of those four witnesses on the stand." J.A. at 403. Rogers was excused as a witness.

Later, defense counsel changed his mind and sought to call these witnesses. The district court then had Keith Echols, Travis Brown, and Willie Cooper brought into the courtroom, whereupon the court ascertained that each would seek to invoke his Fifth Amendment privilege in the presence of the jury. After having discussions with each, the court asked Thomas' counsel if he sought anything further. Counsel informed the court that he had nothing further, and did not request that the witnesses actually be put on the stand to invoke their privilege in the presence of the jury.

"A defendant's right to compel a witness to testify must yield to that witnesses' assertion of his or her Fifth Amendment privilege against self-incrimination when that assertion is founded upon a reasonable fear of prosecution." *United States v. Mack*, 159 F.3d 208, 217 (6th Cir.1998). Blanket assertion of the privilege is not sufficient to meet the reasonable cause requirement. *In re Morganroth*, 718 F.2d 161, 167 (6th Cir.1983). Moreover, privilege cannot be claimed in advance of the questions and must be asserted with respect to each particular question. *Id.* A district court "is necessarily accorded broad discretion in determining whether an invoked Fifth Amendment privilege is meritorious." *Mack*, 159 F.3d at 217. Thus, a district court's ruling is reviewed for abuse of discretion and will be affirmed

unless the appellate court is left with a "definite and firm conviction that the trial court committed a clear error of judgment." *Id.*

All four witnesses that Thomas sought to elicit testimony from were facing pending state law charges. Three of those individuals were charged in various crimes with Thomas and Bond. All four witnesses were represented by counsel; two of those witnesses were able to consult with their lawyers and acted on the advice of counsel at the time they invoked their Fifth Amendment privilege.

We conclude that the district court did not abuse its discretion in allowing Echols, Brown and Rogers to invoke their Fifth Amendment right to refuse to testify. All three of these individuals were involved in other robberies committed with Thomas and/or Bond, and had charges pending as a result. While it is clear that the district court's method for assessing the propriety of these individuals invocation of their Fifth Amendment privilege would not qualify as "textbook," these individuals were presented with the substance of what Thomas' lawyers wanted them to testify about, i.e., Bond's purported inconsistent statements, and their privilege was invoked on that limited basis. Thus, there was no blanket assertion of privilege, as Thomas urges, even though the court did not employ the standard method of eliciting an invocation to a specifically asked question. Inasmuch as even admitting to knowing Thomas and/or Bond could be used against them in their pending state prosecution, these individuals clearly had a reasonable fear of self-incrimination.

■ However, we conclude that the record below is not sufficient to support the district court's determination that Willie Cooper's invocation of the privilege was appropriate. This is especially true in light of the fact that, unlike the others, Cooper had not been charged with either Bond or Thomas in any other proceedings. This notwithstanding, we find the error to be harmless beyond a reasonable doubt in light of the strong evidence of Thomas' guilt in this case. *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt."). The jury was presented not only with Bond's testimony that Thomas was the shooter in the Loomis–Fargo robbery, but also with evidence that Thomas admitted to his then girlfriend, Angela Jackson, that he was the shooter. This fact was corroborated by the Walgreens' surveillance video, wherein the shooter matched Thomas, rather than the taller Bonds. Finally, we note that the government was not required to prove that Thomas was the actual shooter in order to secure his conviction on the charged offenses.

D. The District Court Did Not Abuse Its Discretion In Denying Thomas' Request To Call A Surrebuttal Witness

■ The final issue raised on appeal by Thomas centers around the testimony of Dana Wiggins, Thomas' purported alibi witness. Wiggins testified that she and Thomas were dating in April of 1997, and that Thomas was with her at her residence from April 20, 1997, at about 7:00 pm, until April 21, 1997, at about 2:30 p.m. The Loomis–Fargo robbery took place on April 21, 1997, at approximately 12:30 p.m.

At the time of the robbery, Wiggins was employed at Discount Cellular Paging. The government called Paul Vandenbosch, Chief Operating Officer for Discount Cellular Paging, who testified that the records of Discount Cellular Paging indicated that Wiggins was at work on April 21, 1997, from 9:00 a.m. to 3:00 p.m., and from 3:30

p.m. to 6:00 p.m in the afternoon. Thomas argues that the court erred when it refused to allow him to recall Wiggins as a surrebuttal witness to counter this evidence.

A court's decision whether to admit rebuttal evidence is reviewed for abuse of discretion. *United States v. Levy*, 904 F.2d 1026, 1031 (6th Cir.1990), *cert. denied*, 498 U.S. 1091, 111 S.Ct. 974, 112 L.Ed.2d 1060 (1991).

Thomas argues that the reason that Vandenbosch was called to testify, "for all practical purposes," was to impeach Wiggins with her "prior inconsistent statements." Thomas contends that pursuant to Rule 613(a) of the Federal Rules of Evidence, the government should have first confronted Wiggins with her time records, i.e., the prior inconsistent statements, and given her a chance to explain them. In any event, Thomas argues that the district court abused its discretion when it refused to allow Dana Wiggins to be recalled as a surrebuttal witness.

We find Thomas' argument to be meritless. Vandenbosch did not testify to any prior inconsistent statements of Dana Wiggins; he laid the foundation for substantive evidence that Wiggins' testimony was factually false. Thus, Rule 613 is inapposite. We find no abuse of discretion in the district court's decision not to allow Wiggins an opportunity to "explain" the time records. This claim is accordingly dismissed.

E. The District Court Did Not Err In Granting An Upward Departure When Sentencing Bond

Defendant Anthony Bond's claim of sentencing error focuses on the district court's determination that an upward departure was appropriate under U.S.S.G. § 5K2.2. This section provides in pertinent part:

If significant physical injury resulted, the court may increase the sentence above the authorized guideline range. The extent of the increase ordinarily should depend on the extent of the injury, the degree to which it may prove permanent, and the extent to which the injury was intended or knowingly risked. When the victim suffers a major, permanent disability and when such injury was intentionally inflicted, a substantial departure may be appropriate. If the injury is less serious or if the defendant (though criminally negligent) did not knowingly create the risk of harm, a less substantial departure would be indicated.

U.S.S.G. § 5K2.2.

Bond's sentencing guideline range was 140 to 175 months, based on an offense level of 29 and a Criminal History Category of V. The district court concluded that this was an appropriate case for upward departure under § 5K2.2, and departed upward to a guideline range of 210 to 240 months The court reasoned that the victim in this case, John Day, was about as seriously injured as one can be without being killed. The court also took note of Bond's likelihood of recidivism. The court then granted the government's § 5K1.1 motion based on Bond's substantial assistance and departed downward from the 210 to 240 month range to sentence Bond to 144 months (12 years) incarceration.

We review a district court's factual findings in connection with sentencing under a deferential "clearly erroneous" standard. *United States v. Latouf*, 132 F.3d 320, 321 (6th Cir.1997). However, this court reviews *de novo* the district court's interpretation and application of the sentencing guidelines. *United States v. Sivils*, 960 F.2d 587, 596 (6th Cir.1992).

Bond now asserts that the sentencing judge improperly included in his reasoning for an upward departure Bond's likelihood for recidivism based on his confessions to crimes for which he had not yet

been convicted. During sentencing, the court noted that Bond had committed two violent crimes after the April 1997 Loomis–Fargo robbery and before his arrest in the fall of 1997. In this regard, the court stated:

> The defendant is also charged with two very serious crimes in which he was the gunman. Those charges remain pending in state court and they will be dealt with in the state court context. They tend to show that the defendant has an utter disregard for his fellow citizens. He's really not that different from Mr. Thomas on that particular day outside the Walgreens, he happened to be the driver, but on other days, he has been the gunman. You didn't get an enhancement or he didn't get additional points for those pending charges, and I'm not going to actually change those, that criminal history calculation, because it is conduct that was after the events. But that conduct indicates that the chance of recidivism is far greater than it would otherwise be. That the defendant did not go out and suddenly say it was a terrible thing that I was involved in and I'll never do that again. Rather, he was now happy to become the gunman in later criminal offenses.
>
> \*     \*     \*     \*     \*     \*
>
> The criminal history doesn't adequate [sic] represent the danger that Mr. Bond represents to society because of these two admitted subsequent criminal acts. It doesn't adequately represent his chance for recidivism. It demonstrates beyond any doubt that he certainly didn't reform his life after the tragedy involving Mr. Day, and, in fact, decided he wanted to play the gunman role, the same role that Mr. Thomas played when he shot Mr. Day in the back of the head.

J.A. at 511–514.

The Sentencing Guidelines recognize that a defendant's likelihood of recidivism and the inadequacy of his criminal history category are proper grounds for an upward departure. § 4A1.3 provides, in pertinent part, that:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. . . .

A departure under this provision is warranted when the criminal history category significantly under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes. . . . The court may, after a review of all the relevant information, conclude that the defendant's criminal history was significantly more serious than that of most defendants in the same criminal history category, and therefore consider an upward departure from the guidelines.

Moreover, courts have consistently held that uncharged but relevant criminal conduct may be used in determining a defendant's sentencing guideline range. *See, e.g., United States v. Sanders,* 982 F.2d 4, 10 (1st Cir.1992); *United States v. Galloway,* 976 F.2d 414, 427–28 (8th Cir.1992); *United States v. Newbert,* 952 F.2d 281, 284–85 (9th Cir.1991). Bond does not dispute the uncharged criminal conduct and failed to raise any questions concerning its reliability at the sentencing hearing. Accordingly, we find that the district court properly relied on the information contained in the Presentence Report regarding Bond's uncharged criminal conduct in determining the applicability of an upward departure.

■ Bond also argues that the court erred in applying an upward departure based on the serious physical injury inflicted on James Day. In this regard, the district court explained:

> This is as serious an injury as a person can have to lose the ability to move around, to lose control of one's bowels and to be confined to a wheelchair for the rest of your life is a terrible penalty, terrible thing for someone to have to deal with. This range doesn't really adequately consider that. This only provides for a penalty of up to fourteen years and seven months. Recognizing the purpose for 5K2.2 and looking at the index—the table, we would normally increase the sentencing range in this case.

J.A. at 510. Bond asserts that the robbery guideline used to calculate his offense level, § 2B3.1(b)(2), already provided an enhancement for life-threatening or permanent physical injury. However, § 5K2.0 states, in relevant portion, that:

> ... the court may depart from the guidelines, even though the reason for departure is taken into consideration in determining the guideline range (e.g., as a specific offense characteristic or other adjustment), if the court determines that, in light of unusual circumstances, the weight attached to that factor under the guidelines is inadequate or excessive.

The United States Supreme Court has held that appellate courts should apply an abuse of discretion standard in reviewing a district court's decision to depart from the applicable guidelines because that decision embodies the traditional exercise of discretion by the sentencing court. *Koon v. United States*, 518 U.S. 81, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996). The Court explained:

> before a departure is permitted, certain aspects of a case must be found unusual enough for it to fall outside the heartland of cases in the Guideline. To resolve this question, the district court must make a refined assessment of the many facts bearing on the outcome, informed by its vantage point and day-to-day experience in criminal sentencing. Whether a given factor is present to a degree not adequately considered by the Commission, or whether a discouraged factor nonetheless justifies departure because it is present in some unusual or exceptional way, are matters determined in large part by comparison with the facts of other Guideline cases. District Courts have an institutional advantage over appellate courts in making these sorts of determinations, especially as they see so many more Guideline cases than appellate courts do.

*Id.* at 98, 116 S.Ct. 2035; U.S.S.G. § 5K2.0, cmt.

The district court concluded that a four level increase was justified in this case based on either or both the extreme injury suffered by Mr. Day, and the high chance of recidivism by Bond. We conclude that the departure was appropriate in this case whether based on Bond's likelihood of recidivism or on the extreme physical injury inflicted on the victim. It has been held that a district court may properly consider pending charges in the departure decision. *See, e.g., United States v. Morse*, 983 F.2d 851, 854 (8th Cir.1993) (in circumstances of the case, use of pending charges in combination with other factors was warranted); *United States v. Gaddy*, 909 F.2d 1096, 201 (7th Cir.1990) (Guidelines permit consideration of prior similar adult criminal conduct not resulting in conviction, which covers pending charges). In this case, departure based on the pending charges was proper since the conduct which underlay those charges had been admitted by Bond. Moreover, as detailed by the district court, the life-threatening and permanent injury inflicted on the victim of this crime was of

the most extreme sort. James Day received a gunshot wound to the base of his skull, which could have easily caused his death and which will paralyze him for the rest of his life. In the words of the district court, this crime "was very cold blooded, very intentional, [and] very planned." J.A. at 511.

Accordingly, we find that the district court did not abuse its discretion in applying the upward departure in sentencing Bond.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM Thomas' conviction and Bond's sentence.