UNITED STATES of America,
Plaintiff–Appellee,

v.

James Michael MILLER;  Steven
Michael Miller, Defendants–
Appellants.

Nos. 00–1838, 01–1365.

United States Court of Appeals,
Sixth Circuit.

Oct. 17, 2002.

Before SILER, COLE, and CLAY, Circuit Judges.

CLAY, Circuit Judge.

In Case No. 00–1838, Defendant, James Michael Miller, appeals from the district court's judgment sentencing him to 180 months' imprisonment, five years' supervised release, and a $100 special assessment based upon his plea-based conviction for one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846 and § 841(a)(1). In Case No. 01–1365, Defendant, Steven Michael Miller, son of James Michael Miller, appeals from the judgment of conviction and sentence entered by the district court following Steven Miller's jury-trial conviction for one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846 and § 841(a)(1), and sentencing him to 262 months' imprisonment, along with a five-year period of supervised release, a fine of $4,820 and a special assessment in the amount of $100. For the reasons set forth below, we AFFIRM the district court's judgments in each case.

## BACKGROUND

Defendant James Miller and his son Defendant Steven Miller, and six other co-defendants were indicted on December 22, 1999 in the United States District Court for the Western District of Michigan on one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846 and § 841(a)(1). The indictment alleged that Defendants, along with the other co-defendants, obtained significant quantities of methamphetamine from Christopher Quiroga (a/k/a "Chino") in Chicago, Illinois for resale and distribution in the Western District of Michigan and elsewhere.

James Miller

James Miller pleaded guilty to the conspiracy charge on March 20, 2000 pursuant to a Rule 11 plea agreement, which provided that in return for his guilty plea and cooperation, the government would not oppose giving him a reduction for acceptance of responsibility, provided that he satisfied the criteria for such a reduction; would not object to a sentence at the lowest end of the sentencing guidelines; would not oppose the district court taking his plea under advisement pending sentencing; and would use good faith in determining whether to file a motion for downward departure pursuant to USSG § 5K1.1

and/or Fed.R.Crim.P. 35(b). The parties also stipulated to a base offense level of 34.

Before James Miller's sentencing, the Probation Department prepared a Presentence Report recommending a base offense level of 34, a two-level enhancement for possession of a firearm, a two-level enhancement for obstruction of justice, and no reduction for acceptance of responsibility, for a total offense level of 38. Defendant filed objections as to the obstruction of justice, acceptance of responsibility, and possession of a firearm factors. Before sentencing, the government filed a motion for a downward departure pursuant to USSG § 5K1.1, recommending a three-level departure based upon James Miller's cooperation. Counsel for James Miller also requested that the court consider a downward departure based upon his military service in Vietnam more than three decades ago.

The sentencing hearing for James Miller was held on July 5, 2000. At the hearing, there was testimony given on the obstruction of justice and possession of firearm factors. Specifically, co-defendant James Carlson testified that during the course of the conspiracy, he observed James Miller with a silver- or chrome-colored hand gun, which was identified as Government Exhibit 2, two or three times in January and February of 1998. Carlson testified that he saw Defendant's gun when the latter pulled it out of a duffel bag containing a freezer bag of marijuana and scales. Carlson also testified that he previously saw the leather duffel bag in Defendant's car.

In addition, FBI Special Agent Robert Jones testified about a state police report of a traffic stop of Defendant on March 30, 1998 in which an officer found a brown leather bag in the passenger compartment of the vehicle. Inside the bag was an unloaded, six-shot .38 caliber Smith and Wesson revolver, which was Government Exhibit 2. Also found in the bag were six rounds of .38 caliber ammunition, a large bag of marijuana, and a small bag containing a white residue that tested positive for methamphetamine.

At his sentencing hearing, Defendant claimed that while he possessed the revolver, it had nothing to do with his drug trafficking. According to Defendant, the only reason the revolver was found in his car by the state police on March 30, 1998 was because he was moving from one location to another, and "on that particular day every possession I had ... was in the vehicle." (J.A. at 110–12.) Defendant also admitted that while he showed a revolver to Carlson, he claimed that it was not the revolver identified and admitted as Government Exhibit 2. Rather, Defendant claimed that the revolver in his possession was actually an "antique" Colt pistol that had a date from the 1890s on the barrel. Defendant maintained "this sounds like a bizarre story, but it's true." (J.A. at 113).

At the conclusion of the sentencing hearing, the district court denied James Miller's three objections to the presentence report, leaving his sentencing guidelines score at level 38, criminal history category I, for a guidelines range of 235 to 293 months. The district court then granted the government's motion for a three-level downward departure pursuant to USSG § 5K1.1, but denied defense counsel's request for a departure based upon Defendant's military service. Thus, James Miller's final offense level was 35–I, for a guidelines range of 168 to 210 months. The district court then imposed a sentence of 180 months' imprisonment, with five years' supervised release, and a $100 special assessment. James Miller now appeals his sentence.

Steven Miller

Before his trial, Steven Miller filed a motion on February 28, 2000 to suppress

statements that he made to the FBI at the time of his arrest on January 7, 2000 when FBI agents and local police went to the Miller residence to arrest Steven Miller and his father pursuant to the indictment in this case. At the suppression hearing, FBI Special Agent Robert Jones testified that Steven Miller's mother initially told the law enforcement officials present that neither her son nor her husband was at home. However, once the police were allowed inside the home, Mrs. Miller admitted that her son was in the front bedroom. Steven Miller was eventually found hiding in the closet of his bedroom. While looking for Steven Miller, Agent Jones announced that he had an arrest warrant for him.

According to Agent Jones, Steven Miller was handcuffed and taken into the kitchen of the Miller home where he was informed that he had been indicted and was under arrest. Agent Jones then read Steven Miller his rights from a *Miranda* form. According to Agent Jones, Steven Miller said that he understood his rights. He read and signed the waiver portion of the form. Agent Jones testified that he did not make any promises to Steven Miller or say that he would be released if he talked. Agent Jones also testified that he told Defendant that truthfulness on his part would be taken into account by the court. During the subsequent questioning by the police, Defendant was allowed to smoke and had a glass of water.

In contrast to Agent Jones' testimony, Steven Miller testified at the suppression hearing that he was never advised that he was under arrest and that while he was shown the rights form, no one read it to him or went over it with him. Defendant also claimed that he only glanced over the form, but did not understand it. Nonetheless, Defendant admitted that he signed the form, but believed that signing the

form only meant that the law enforcement officials could talk to him. According to Steven Miller, Agent Jones told him that he could help himself out by talking to the agent. Steven Miller testified that the was under the impression that he would go to jail if he did not talk to Agent Jones. However, Steven Miller acknowledged that, apart from saying that it would help him to talk, Agent Jones made no "promises, assurances, guarantees or anything." According to Steven Miller, he believed that he had to talk with the law enforcement officials present and that he would be released after talking with them. Steven Miller also testified that he did not believe that he had a choice about talking with the agent "because that's his way of getting me to talk, was to come there and put me in handcuffs and hold the driving while license suspended, I guess, over my head." (J.A. at 124–25, 127.) Steven Miller was clad in boxer shorts and handcuffed during the interview.

At the suppression hearing, Steven Miller acknowledged that he was a high school graduate and had taken approximately two years of college. He had been arrested at least five times before January 7, 2000, and had been given *Miranda* warnings in the past. Although Steven Miller could not recall whether he was advised of his *Miranda* rights during questioning at the FBI office in August of 1998, he was shown the waiver document that he signed at that time. In response to the district court's questioning, Steven Miller repeated that he thought he would be arrested on the morning of January 7, 2000 if he did not talk to the agent and that he believed that Agent Jones was making good on his promise to make him talk. He also admitted to the district court that he understood his rights at the time he signed the waiver form and that he agreed to talk to the law enforcement officers without a lawyer being present. However, Steven Miller

maintained that his statements to Agent Jones were involuntary because he would not have talked with him had he known that he was under arrest. Steven Miller further testified that during questioning by Agent Jones on the morning of January 7, 2000, he stated that he knew Quiroga, but did not have any knowledge about him distributing drugs. He also denied that he had trafficked in methamphetamine with Quiroga or anyone else.

At the hearing, Jones testified that Defendant, in response to his questioning in the kitchen of the Miller home, admitted that he had drug dealings with Quiroga. From between late 1997 and the middle of 1998, he purchased approximately fifty kilograms of methamphetamine from Quiroga. In addition, Steven Miller stated that he and Aaron Greene, another co-defendant, obtained methamphetamine from Quiroga on several occasions, and that he was also present when Scott Mabrey, another co-defendant, obtained methamphetamine from Quiroga. During cross-examination, Agent Jones identified the form, dated January 8, 2000, in which he memorialized the interview with Steven Miller. Agent Michael Heffron, who was also present during the police questioning of Steven Miller, confirmed Agent Jones' testimony that Defendant admitted to having purchased about fifty kilograms of methamphetamine from Quiroga.

Following the hearing on May 3, 2000, the district court denied the suppression motion finding that Steven Miller's statements to the police were voluntary.

By October of 2000, all the defendants, except for Steven Miller and Christopher Quiroga had entered guilty pleas. On October 24, 2000, a superseding indictment was returned against Steven Miller and Quiroga alleging that the conspiracy involved "at least 500 grams of a mixture or substance containing methamphetamine."

As the government points out, the superseding indictment specified the drug quantity to satisfy the requirements of *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), which the Supreme Court had decided while this case was pending. Shortly before Steven Miller's trial, Quiroga pleaded guilty and agreed to cooperate. Thus, Steven Miller was the only defendant in the conspiracy to go to trial.

A jury trial commenced on November 13, 2000 and concluded on November 17, 2000, with the jury returning a guilty verdict. Prior to trial, the district court, over Steven Miller's objection, granted the government's motion for permission to photograph a tattoo on Steven Miller's arm bearing the name "Villa Lobos." Five witnesses testified for the government. Three of the witnesses, Aaron Greene, Scott Mabrey and Christopher Quiroga, were former co-defendants who had pleaded guilty and were testifying pursuant to their plea agreements, which required their cooperation with the government. The fourth witness was Defendant's ex-girlfriend, Jennifer Stoffel. The final witness was FBI Special Agent Robert Jones. Defendant testified in his own behalf as the only defense witness.

At trial, the government introduced evidence that Steven Miller graduated from high school in Stevensville, Michigan in 1991 and that he knew co-defendants Greene and Mabrey from the Stevensville area. While in high school, Steven Miller was introduced to Quiroga by a mutual acquaintance. Quiroga, who lived in the Chicago area, was a member of the Villa Lobos street gang and later joined the Latin Kings gang. At some point, Steven Miller and his co-defendants Greene and Mabrey began purchasing cocaine and marijuana from Quiroga.

In December of 1996, Mabrey moved to Chicago. About that time Greene and Mabrey began purchasing methamphetamine from Quiroga. Subsequently, while Greene and Quiroga were visiting Steven Miller in Florida during the spring break of 1997, Quiroga told Steven Miller that he was selling methamphetamine to his father, James Miller.

After returning to Michigan in June of 1997, Steven Miller moved in with Greene and began buying methamphetamine from Quiroga and selling it to his father and another individual by the name of Ted Reinbold. Greene testified that he accompanied Steven Miller several times when they went to Chicago to buy methamphetamine, and that Steven Miller usually obtained one or two pounds of methamphetamine on each trip. Greene witnessed Steven Miller purchase a total of nine or ten pounds of methamphetamine from Quiroga. According to Greene, Steven Miller kept about 10% for himself and sold the rest to his father and Reinbold. Greene also testified that he himself obtained about twenty pounds of methamphetamine from Quiroga and that Steven Miller obtained more than twice that amount. According to Greene, the drugs were fronted and paid for after they were sold.

During Greene and Steven Miller's visits to Chicago, they also stopped to see Mabrey. Mabrey testified that Steven Miller obtained methamphetamine from Quiroga about four or five times, usually in two-pound quantities. On a couple of occasions, Mabrey rode back to Michigan with Steven Miller. On one of these occasions, Steven Miller took two pounds of methamphetamine to his residence on a lake near Kalamazoo where Steven Miller's father and Reinbold were each given one pound.

Quiroga testified that Steven Miller was his second-best methamphetamine customer, estimating that Defendant purchased fifteen to twenty pounds of methamphetamine from him. However, Defendant stopped visiting Quiroga after he failed to pay for two pounds of methamphetamine. When Defendant subsequently paid a visit to Quiroga at his house in Melrose Park, Illinois, Quiroga pointed a gun at him and told him to leave. According to Greene and Mabrey, Quiroga quit selling methamphetamine to Defendant because he owed Quiroga $24,000.

The government also presented the testimony of Steven Miller's former girlfriend, Jennifer R. Stoffel. In the fall of 1997, Steven Miller visited Stoffel in Detroit where she was attending graduate school at Wayne State University. According to Stoffel, Steven Miller, who had a new car and a "bundle" of cash, told her he was selling real estate. Steven Miller also visited Stoffel before Thanksgiving in early November, and they stayed at a $500 suite at the Westin Hotel for several hours. On that occasion, Steven Miller informed Stoffel that he wasn't selling real estate, but was dealing methamphetamine through Quiroga ("Chino"). Stoffel also observed that Steven Miller was wearing a "Villa Lobos" tattoo on his arm. When Stoffel inquired about the tattoo, Steven Miller "indicated that that was what was making him the money and that that was a level of trust with Chino that he had established." (J.A. at 354.) Steven Miller also told Stoffel that he was working with his father and "Ted," and that he was selling two kilograms of methamphetamine "within a week." Defendant also showed her a metal briefcase containing "several thousand" dollars that he said was intended for Quiroga.

Stoffel also visited Steven Miller for a party at his lake house near Kalamazoo over the Thanksgiving weekend of 1997, and was introduced to "Ted," whom Steven Miller said "gets the drugs moved around."

Steven Miller's father also visited briefly, and got together with him privately in a bedroom. After his father left, Steven Miller showed Stoffel about $1,000, indicating that it was drug money for "Chino."

Thereafter, Steven Miller offered Stoffel an expensive diamond-encrusted engagement ring, which she refused to accept. Thereafter, in December of 1997, Steven Miller took Stoffel on a Carribean cruise using the money that he obtained from returning the ring. Subsequently, Stoffel found out that Defendant paid for the cruise from money that he owed Quiroga for drugs. In early January of 1998, after Mabrey was arrested, Stoffel met Steven Miller for the last time in a hotel in Northville, Michigan, where Defendant showed her a "softball"-sized quantity of methamphetamine from his coat pocket.

FBI Special Agent Robert Jones testified about telephone records from July to December of 1997 indicating that 165 calls were made from Steven Miller's phone to a pager used by Quiroga or his associates. Agent Jones also testified about the statements that Steven Miller made to him after his arrest. According to Jones, Steven Miller told him that he met Quiroga in 1987, obtaining cocaine from Quiroga about "1,000 times" from 1987 to 1997. In 1997, Quiroga offered to sell methamphetamine to Steven Miller, who said that his father could sell it through his motorcycle gang. Agent Jones testified that Defendant told him that, after he returned from Florida in 1997, he found out that Quiroga was selling methamphetamine to his father. At that point, Steven Miller "reinserted himself as the middleman" between Quiroga and his father. From late 1997 until 1998, Steven Miller obtained about fifty kilograms of methamphetamine from Quiroga, who acquired the drugs through a Mexican connection. Usually, Defendant got a kilogram, took out six ounces to sell

to Reinbold for $24,000, and sold the remainder to his father, representing it to be one kilogram. Although Steven Miller's father "often complained about being shorted ... he didn't really do anything because he was still making money on the methamphetamine." Defendant also obtained methamphetamine with Greene and Mabrey. Through Agent Jones, the government introduced a photograph of Steven Miller's Villa Lobos tattoo.

After the government rested, Steven Miller testified on his own behalf, stating that while he obtained drugs, mostly cocaine, in "user quantity" from Quiroga, he never resold any of these drugs. Defendant further testified that while his father sold methamphetamine obtained from Quiroga, he did not sell methamphetamine to his father or to anyone else. Steven Miller also denied that he ever went to Chicago with Greene to obtain methamphetamine or that he owed Quiroga money for methamphetamine. Defendant also denied that he told Agent Jones that he obtained fifty kilograms of methamphetamine or that he sold methamphetamine. According to Defendant, Greene, Mabrey and Quiroga all lied about his involvement with them.

After deliberating for about one-half hour, the jury found Steven Miller guilty of conspiracy as charged. The jury also returned a special verdict finding that Steven Miller was responsible for "500 or more grams" of methamphetamine. The jury was also polled, and each juror stated that Steven Miller was involved with at least 500 grams of a mixture or substance containing methamphetamine.

Steven Miller was sentenced on February 21, 2001. The district court, rejecting Defendant's objection to the drug quantity figure, found that he was accountable for 6.8 kilograms of methamphetamine, which established a base offense level of 36. However, the district court noted that this

was a "conservative estimate," as "[t]he full extent of the defendant's involvement was likely much greater and may have been as great as 50 kilograms." The district court pointed to Quiroga's estimate of 15 pounds in making its determination of drug quantity, since Quiroga was the conspiracy's supplier. The district court then added two levels for obstruction of justice, based upon a finding by a preponderance of the evidence that Defendant testified falsely at his suppression hearing and trial. After granting Steven Miller's objection about his criminal history score, the district court reduced his criminal history category to category II, for a guideline range of 262–327 months. However, the district court rejected Steven Miller's argument that he should be sentenced based upon the pre-November 1997 sentencing manual rather than the November 2000 manual used by the probation office because his involvement in the conspiracy continued after November 1, 1997. The district court then imposed a sentence of 262 months' imprisonment, along with a five-year period of supervised release, a fine of $4,820 and a special assessment in the amount of $100. Steven Miller now appeals his conviction and sentence.

## DISCUSSION

### Case No. 00–1838: James Miller's Appeal

### I.

Defendant first argues that the district court erred in considering the prohibited factor of race in imposing sentence. "A sentencing decision based on race qualifies as both a violation of law and an incorrect application of the Guidelines, and therefore can be reviewed by this court." *United States v. Guidry*, 199 F.3d 1150, 1161 (10th Cir.1999); *see also United States v. Onwuemene*, 933 F.2d 650, 651 (8th Cir.1991)(noting that "sentencing an offender on the basis of factors such as race,

national origin, or alienage violates the Constitution"). Because Defendant did not object below, we thus review the issue for plain error. Under the plain error test of Rule 52(b) of the Federal Rules of Criminal Procedure, there must be "(1) error, (2) that is plain, and (3) that affects substantial rights." An appellate court may correct such an error not raised at trial, "but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings." *United States v. Cotton*, —— U.S. ——, ——, 122 S.Ct. 1781, 1785, 152 L.Ed.2d 860 (2002) (citing *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)) (quoting *United States v. Olano*, 507 U.S. 725, 731, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993)); *see also United States v. Carter*, 236 F.3d 777, 783–84 (6th Cir.2001).

In this case the district court did not improperly consider Defendant's race in imposing sentence. According to the presentence report, Defendant, a fifty-five-year-old white male, had previously held a series of responsible sales positions, with an annual income of over $100,000 at one time. In his allocution, defense counsel thus noted:

> I've never really represented a man in Mr. Miller's situation at his age, what he's done in life, and being involved in something like this. Most of our defendants I think are young, like the co-defendants in this case, and they are foolish and they do young, foolish things. I am absolutely stymied and puzzled why Mike Miller got involved in this. I still do not understand that. . . . As you can see the guidelines, if the Court were to sentence as the recommendation, is almost 20 years in prison. . . . You know, I don't know how many innocent people he affected with his activities, but it just seems way out of proportion . . .

and here we are today about, you know, facing a situation where he's dug a deeper hole for himself, and again, that puzzles me. I just can't understand why, I don't know what happened.

In sentencing Defendant, the district court, after noting that it could not offer an explanation for Defendant's behavior, addressed the issue raised by defense counsel about the high guidelines in drug cases. Specifically, the district court remarked:

> And the one thing that I know that Congress thinks is bad is drugs. How do I know that? I look at the chart that your lawyer was discussing with me, and I see that the very last line, 43, is life, and guess what, I have had three or four individuals in front of me last month that scored a 43, and what was their crime? They were dealing crack.... Who wrote that guideline? Congress. What did they write it for? They wrote it for a drug dealer. Congress thinks drug dealers are dangerous.

In the face of such a stiff penalty, the district court commented that there was no apparent reason why Defendant would deal in drugs. Then the district court went on to compare Defendant to the young African–American men, who had recently appeared before the district court for sentencing for their convictions for dealing crack cocaine. The district court made the following remarks:

> I can tell you something I do know, the people that were at [offense level] 43 last month were black and young and had no father, and dealing crack was a way of life, almost a culture, if you will, not a crime. None of them—eight guys convicted, not a single one used crack, not a single one. Why did they deal it? Because that's what their community was all about, that's what they learned when they were growing up. You had a

chance, you were born white. That's an advantage in this country. To be born black is a disadvantage. You were born at an advantage and you had reached the age of wisdom, maturity. There is no excuse for you breaking the law. None. I can understand the kids in Benton Harbor making this mistake. I don't understand you. I don't understand you.

Read in context, it is apparent that the district court's reference to race was made in response to defense counsel's subtle plea for the court to go lightly on Defendant because he was an atypical drug dealer in light of his age and situation in life. Contrary to Defendant's contention, the district court was not taking his race (or age) into account for sentencing purposes. Rather, the district court made the comparison to show that Defendant was not being treated differently than any other drug dealer. Although the district court's reference to race in this respect was ill-advised, we do not believe that the court sentenced Defendant on the basis of his race.

As the government points out, other circuits have found no error when a district court makes a passing reference to race or natural origin at sentencing in response to remarks by defense counsel during allocution *See Guidry*, 199 F.3d at 1161–62 (finding no error when the district court referred to race in response to the defense contention that she was entitled to a downward departure on the basis of her service to the minority community); *United States v. Jacobson*, 15 F.3d 19, 23 (2d Cir.1994) (rejecting a claim of error alleging that the defendant's sentence was based upon his national origin and status as a naturalized citizen). Further, the present case is clearly distinguishable from *Onwuemene*, 933 F.2d at 651, where the district court improperly considered Onwuemene's alien

status at sentencing. In *Onwuemene,* the district court's reliance on the defendant's status was evident when it flatly stated: "The other thing that I feel warrants imposition at the high end of the guideline range: You are not a citizen of this country." *Id.* Similarly, this case is distinguishable from *United States v. Edwardo–Franco,* 885 F.2d 1002, 1005 (2d Cir.1989), where the district court, in sentencing the defendants, was reversed for making reference to their Colombian nationalities and the little regard that Columbians allegedly have for the judicial system of their own country, stating that "they should have stayed where they were. Nobody told them to come here." The reference to race by the district court in this case clearly does not come close to being improper.

## II.

The district court also did not err in imposing a two-level enhancement under USSG § 2D1.1(b)(1) for James Miller's possession of a firearm. A district court's factual findings that a defendant possessed a firearm during a drug crime under USSG § 2D1.1(b)(1) is reviewed for clear error. *United States v. Williams,* 176 F.3d 301, 307 (6th Cir.1999). "The district court may rely on any competent evidence in the record; however, the district court's findings must have 'some minimum indicium of reliability beyond mere allegation.'" *United States v. Hough,* 276 F.3d 884, 891 (6th Cir.2002) (quoting *United States v. Ward,* 68 F.3d 146, 149 (6th Cir.1995)). A finding of fact is clearly erroneous when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer,* 470 U.S. 564, 573, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985) (citation omitted). However, a district court's legal conclusions regarding the application of the sentencing guidelines

are reviewed *de novo.* *United States v. Saikaly,* 207 F.3d 363, 367 (6th Cir.2000).

USSG § 2D1.1(b)(1) provides for a two-level increase to the base offense level for a person convicted of certain drug trafficking offenses "[i]f a dangerous weapon (including a firearm) was possessed." Note 3 to the commentary section of USSG § 2D1.1(b)(1) states in pertinent part:

> The enhancement for weapon possession reflects the increased danger of violence when drug traffickers possess weapons. The adjustment should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense. For example, the enhancement would not be applied if the defendant, arrested at his residence, had an unloaded hunting rifle in the closet. . . .

USSG § 2D1.1(b)(1), n. 3.

To show enhancement pursuant to USSG § 2D1.1(b)(1), the government must establish by a preponderance of the evidence that the defendant possessed the firearm during the drug-trafficking offense. *Id.* (citing *United States v. Sanchez,* 928 F.2d 1450, 1460 (6th Cir.1991)). Once the government satisfies its burden, "a presumption arises that such possession was connected to the offense." *Saikaly,* 207 F.3d at 368.

Contrary to Defendant's claim, the government established by a preponderance of the evidence that there was a connection between the weapon and the offense. In this case, Defendant pleaded guilty to the charge of conspiracy to possess with intent to deliver and to deliver methamphetamine from the spring of 1997 to August of 1998. At the sentencing hearing, co-defendant James Carlson testified that during the course of the conspiracy, he observed Defendant with a silver- or chrome-colored hand gun, which was identified as Government Exhibit 2, two or three times in

January and February of 1998. Carlson testified that he saw Defendant's gun when the latter pulled it out of a duffel bag containing a freezer bag of marijuana and scales. Carlson also testified that he previously saw the leather duffel bag in Defendant's car. In addition, FBI Special Agent Robert Jones testified at Defendant's sentencing hearing that Defendant was stopped by state officers on March 30, 1998 and that a brown leather bag was found in the passenger compartment of the vehicle. Inside the bag was an unloaded, six-shot .38 caliber Smith and Wesson revolver, which was Government Exhibit 2. Also found in the bag were six rounds of .38 caliber ammunition, a large bag of marijuana, and a small bag containing a white residue that tested positive for methamphetamine. In view of the evidence, the district court did not err in imposing a two-level enhancement under USSG § 2D1.1(b)(1).

■ Defendant also intimates that the district court's factual finding that he possessed a firearm in connection with the offense violated *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490, 120 S.Ct. 2348. In light of the Supreme Court's recent decision in *Harris v. United States*, —— U.S. ——, 122 S.Ct. 2406, 153 L.Ed.2d 524 (2002), *Apprendi* is clearly not applicable to the instant case inasmuch as Defendant's sentence did not exceed the statutory maximum penalty.

### III.

■ The district court also did not err by refusing to grant Defendant's request for a three-level reduction for acceptance of responsibility under USSG § 3E1.1. A sentencing court's determination regarding whether a defendant is entitled to a reduction of offense level for acceptance of responsibility is reviewed for clear error. *United States v. Meacham*, 27 F.3d 214, 216 (6th Cir.1994). Note 5 to the Commentary appended to USSG § 3E1.1. provides: "The sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility. For this reason, the determination of the sentencing judge is entitled to great deference." *See United States v. Chalkias*, 971 F.2d 1206, 1216 (6th Cir.1992) (finding that a district court's determination will "nearly always" be sustained). However, where "the only issue presented is the propriety of the application of the adjustment to uncontested facts," a question of law is presented and this Court reviews *de novo* the trial court's acceptance of responsibility determination. *See United States v. Childers*, 86 F.3d 562, 563 (6th Cir.1996).

USSG § 3E1.1(a) provides that "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense, decrease the offense level by 2 levels." A defendant may qualify for a further one-level decrease if "the defendant has assisted authorities in the investigation or prosecution of his own misconduct by ... timely providing complete information to the government concerning his own involvement in the offense [ ] or [ ]timely notifying authorities of his intention to enter a plea of guilty...." USSG § 3E1.1(a); *United States v. Jeter*, 191 F.3d 637, 639 (6th Cir.1999). Application Note 1 to USSG § 3E1.1 lists eight factors that a district court may consider in determining the appropriateness of an adjustment, among them, "truthfully admitting the conduct comprising the offense(s) of conviction, ... voluntary surrender to authorities prompt-

ly after commission of the offense ... [and] voluntary assistance to authorities in the recovery of the fruits and instrumentalities of the offense." USSG § 3E1.1, cmt. n. 1.

The defendant bears the burden of proving acceptance of responsibility by a preponderance of the evidence. *United States v. Donathan,* 65 F.3d 537, 541 (6th Cir.1995). Generally, acceptance of responsibility is indicated by entering a plea of guilty. *United States v. Tilford,* 224 F.3d 865, 867 (6th Cir.2000). However, while a guilty plea does constitute significant evidence of acceptance of responsibility, such acceptance may be outweighed by criminal conduct of the defendant after his confession. *Childers,* 86 F.3d at 563–64; *Jeter,* 191 F.3d at 641.

In this case, there was sufficient evidence in the record supporting the district court's determination that Defendant was not entitled to a three-level reduction for acceptance of responsibility. The district court, after quoting from the application note to USSG § 3E1.1, rejected Defendant's request for a three-level reduction as follows:

> The Court agrees with the Pre–Sentence Investigator that the Defendant had not truthfully admitted all of his relevant conduct, including information relating to drug shipments during the term of the conspiracy.

> The Court also believes the Defendant's continued criminal conduct, especially attempts to influence the confidential informant, shows that [he] has not clearly accepted responsibility for his offense. In fact, probably more than the upward adjustment for obstruction is the fact that he did not accept responsibility proved by his own testimony in this courtroom this morning.

> Never have I seen a clearer case and never, in my current memory, have I

seen a man lie about so much so consistently.

As the government points out, Defendant received a two-level enhancement for obstruction of justice pursuant to USSG § 3C1.1 for attempting to influence a witness from sharing information with law enforcement about his son's involvement in the conspiracy. Specifically, James Edwards, one of the witnesses at Defendant's sentencing hearing, testified that Defendant told him "to lie and not implicate his son" with information about his son's involvement in the drug trafficking conspiracy. (J.A. at 97). Also, Defendant did not appear to tell the truth about his involvement in the drug conspiracy, claiming that he got involved "because of a debt of [his] son," but also saying that he got involved well before his son's debt. (J.A. at 119–125.) Given that Defendant engaged in the obstruction of justice and was not forthcoming about his involvement in the drug conspiracy, the district court was justified in denying his request for a three-level reduction for acceptance of responsibility.

### IV.

In addition, there is no merit to Defendant's claim that the government breached the plea agreement by standing mute on the issue of acceptance of responsibility. Because Defendant did not object below, we review this issue for plain error. *United States v. Koeberlein,* 161 F.3d 946, 949 (6th Cir.1998).

In deciding whether a plea agreement has been breached, this Court determines what the defendant "reasonably understood" when he entered into the agreement. *United States v. Phibbs,* 999 F.2d 1053, 1081 (6th Cir.1993). "[T]he most persuasive evidence of what a defendant reasonably appreciated as his bargain is found in the plain language of the court-

approved agreement." *Id.* In ¶ 6 of the plea agreement, the government agreed "not to oppose giving the defendant a reduction for acceptance of responsibility under USSG § 3E1.1 of the Sentencing Guidelines (if applicable), provided he satisfies the criteria for such a reduction." After hearing the evidence presented at the sentencing hearing, the district court asked for final argument from counsel. Addressing the possession of firearms and obstruction of justice factors, counsel for the government stated:

> On the issue of acceptance of responsibility, that's part of the plea agreement the Government agreed not to oppose reduction for acceptance of responsibility provided the defendant's satisfied the criteria for that reduction, and so the Government will stand mute on the acceptance issue.

The district court then denied the reduction.

On appeal, Defendant argues that the government breached the plea agreement by standing mute on the acceptance of responsibility issue, which sent "a clear signal to the judge that the government would not be discomfited should the Court deny the acceptance adjustment. By standing mute the government only technically adhered to the agreement and consequently, it violated the spirit of the agreement." Defendant's Br. at 29–30. According to Defendant, "the government should have indicated that the defendant had met the criteria which in fact he had." Defendant's Br. at 30. Defendant also claims that the government breached the agreement "when it urged the district court to reduce the guideline range by only three levels and not go below the statutory minimum because the government might file a Rule 35." Defendant's Br. at 30.

Contrary to Defendant's assertion, the government did not breach the plea agreement by standing mute on the issue of acceptance of responsibility. First of all, the government did not oppose giving him a reduction for acceptance of responsibility; rather, the government took no position on the issue. Moreover, even if Defendant satisfied the criteria for acceptance of responsibility, the plea agreement did not require the government to take the affirmative step of supporting a reduction for acceptance of responsibility. In any case, the record indicates that Defendant did not satisfy said criteria. *See United States v. Adams,* 197 F.3d 1221, 1223 (8th Cir.1999) (finding that the government did not breach agreement to recommend reduction for acceptance of responsibility because the recommendation was conditioned upon conduct consistent with acceptance of responsibility).

## V.

■ Defendant next argues that the district court erred in failing to state the factors upon which it relied in deciding the extent of its downward departure from the sentencing guidelines. Here, Defendant's claim of error is not reviewable because it is an attempt to appeal the extent of the district court's downward departure. *See United States v. Gregory,* 932 F.2d 1167, 1169 (6th Cir.1991)("A sentence which is within the Guidelines, and otherwise valid ... is not appealable on the grounds that the sentencing judge failed to depart from the Guidelines on account of certain factors which the defendant feels were not considered by the Guidelines and should reduce his sentence.") (quoting *United States v. Draper,* 888 F.2d 1100, 1105 (6th Cir.1989)). We note, however, that the district court considered the factors set forth in USSG § 5K1.1 and provided a sufficient articulation of its reasons for granting a three-level reduction. *See*

*United States v. Bright*, 3 Fed.Appx. 232 (6th Cir.2001).

## VI.

Finally, Defendant claims that the district court abused its sentencing discretion in failing to consider his military service as a basis for a downward departure. This issue is not appealable because there is no indication that the district court wrongly believed that it lacked authority to depart from the sentencing guidelines in rejecting Defendant's military service as grounds for departure. *United States v. Clements*, 144 F.3d 981, 984 (6th Cir.1998).

Accordingly, we AFFIRM the district court's judgment sentencing James Miller to 180 months' imprisonment, with five years' supervised release, and a $100 special assessment based upon his guilty plea conviction for one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846 and § 841(a)(1).

Case No. 01–1365: Stephen Miller's Appeal

Defendant Steven Miller first claims that the district court abused its discretion in admitting evidence that he had a tattoo on his arm bearing the name "Villa Lobos." In *United States v. Abel*, 469 U.S. 45, 105 S.Ct. 465, 83 L.Ed.2d 450 (1984), the Supreme Court stated:

> A district court is accorded wide discretion in determining the admissibility of evidence under the Federal Rules. Assessing the probative value of common membership in any particular group, and weighing any factors counseling against admissibility is a matter first for the district court's sound judgment under Rules 401 and 403 and ultimately, if the evidence is admitted, for the trier of fact.

*Id.* at 54, 105 S.Ct. 465.

Rule 401 of the Federal Rules of Evidence defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 403 contains a limitation that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." "Unfair prejudice 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.'" *United States v. Gibbs*, 182 F.3d 408, 429 (6th Cir.1999) (quoting from *United States v. Bonds*, 12 F.3d 540, 567 (6th Cir.1993)). When ruling on the district court's decision regarding the question of the probative value versus the unfair prejudice of evidence, a reviewing court takes "a maximal view of the probative effect of the evidence and a minimal view of its unfairly prejudicial effect." *Id.*

In arguing this issue, both parties rely upon *Gibbs*. In *Gibbs*, the defendants, members of a gang called the Short North Posse, were charged with conspiracy to distribute crack cocaine, along with a number of other drug and firearms charges. To show that the defendants were affiliated with the gang, the government introduced one group of photos showing two t-shirts with gang slogan and references to the gang, which were seized during the search of one of the defendant's home, and a second group of photos with pictures of graffiti-covered buildings that included references to the gang. This Court in *Gibbs* held the photos of the t-shirts to be admissible, finding that the t-shirts were highly

probative of the government's claim that one of the defendants was a member of the gang and rejecting the defendant's contention that the admission of the t-shirts was unfairly prejudicial to his trial. In *Gibbs*, this Court found that "[g]ang affiliation is particularly relevant, and has been held admissible, in cases where the interrelationship between people is a central issue." *Id.* at 430 (quoting from *United States v. Thomas*, 86 F.3d 647, 652 (7th Cir.1996)). However, *Gibbs* found that the second group of photos should not have been admitted because they were unfairly prejudicial since their only relevant purpose was to show that the gang existed, which was not an issue at trial and which had been proven by a substantial amount of other evidence. Nevertheless, this Court in *Gibbs* found that the error relating to the admission of the second group of photos was harmless because the photos did not have a substantial effect on the verdict.

■ In the present case, we do not believe that the district court abused its discretion in admitting evidence that Steven Miller had a tattoo bearing the name "Villa Lobos." As the government points out, the central issue at trial was whether Defendant was a member of the conspiracy charged with distributing methamphetamine. Here, the fact that Defendant had a Villa Lobos tattoo on his arm was strong evidence connecting Defendant with his drug supplier, Christopher Quiroga. Although Defendant was not a member of the Villa Lobos gang, the evidence indicated that he obtained the gang tattoo to curry favor with Quiroga, who was a member of the gang. Thus, the gang affiliation was relevant in this case since a key issue was the interrelationship of the individuals participating in the conspiracy. *Id.* at 430.

■ Contrary to Defendant's contention, the probative value of the tattoo evidence was not substantially outweighed by

the danger of unfair prejudice under Rule 403. Although Defendant claims that the evidence was "inherently prejudicial because of the disproportionately high percentage of the trial devoted to that evidence and because of the prosecutor's use of that evidence during closing argument as a way to persuade the jury that the Appellant should be convicted," Defendant's Br. at 42, the record indicates that a relatively small portion of the evidence presented at trial addressed the gang affiliation issue, and that the prosecutor only made reference to the tattoo evidence in rebuttal closing argument after defense counsel argued that the tattoo evidence was not relevant and was merely offered to make the Defendant "look like a bad person." As in *Gibbs*, where this Court held that the probative value of the t-shirts connecting the defendant with a gang's drug conspiracy was not substantially outweighed by the danger of unfair prejudice, we conclude that the district court did not abuse its discretion in ruling that the probative value of the evidence showing that Defendant had a tattoo bearing the name of his drug supplier's gang was not outweighed by the danger of unfair prejudice. Moreover, even if the district court erred in admitting the tattoo evidence, any error was harmless in view of the overwhelming weight of the other evidence showing that Defendant participated in a conspiracy to distribute methamphetamine.

II.

The district court also did not abuse its discretion in admitting the background testimony of the conspiracy and in denying Defendant's attempt to admit co-conspirator testimony against the government.

■ Defendant first argues that the government was allowed to introduce testimony from various witnesses concerning

their prior relationship and dealings with Defendant that formed part of the conspiracy. Because Defendant objected only to the testimony of Aaron Greene, we review this issue for plain error, with the exception of Greene's testimony. According to Greene, he was introduced to Quiroga by Defendant in the summer of 1996. At that time, Greene wanted to buy some marijuana, and Defendant was attempting to buy cocaine from Quiroga. The district court, overruling Defendant's objection under Rule 404(b) grounds, admitted Greene's testimony as background evidence, but gave a limiting instruction that Defendant was not on trial for anything except conspiracy to possess and deliver methamphetamine.

The government correctly argues that Greene's testimony was admissible for showing the background and development of a conspiracy, and does not implicate F.R.E. 404(b). As this Court stated in *United States v. Hardy*, 228 F.3d 745 (6th Cir.2000):

> Proper background evidence has a causal, temporal or spatial connection with the charged offense. Typically, such evidence is a prelude to the charged offense, is directly probative of the charged offense, arises from the same events as the charged offense, forms an integral part of a witness's testimony, or completes the story of the charged offense.

*Id.* at 748 (citation omitted). Here, the district court did not err in admitting Greene's testimony to show how Mabrey, a member of the conspiracy, became acquainted with Quiroga, and how he eventually joined with Defendant and others to purchase methamphetamine from Quiroga. *See United States v. Paulino*, 935 F.2d 739, 755 (6th Cir.1991) (finding no abuse of discretion when the district court admitted testimony showing "how the conspirators became associated and how the conspiracy came about").

Defendant also contends that the district court erred in admitting (1) Mabrey's testimony that he purchased drugs from Quiroga for his own personal use long before the conspiracy began; (2) Quiroga's testimony about drug transactions that preceded his involvement in the conspiracy and about selling cocaine and marijuana to Defendant before the conspiracy; and (3) Stoffel's testimony about Defendant's use of marijuana during the early stage of their relationship. Although Defendant claims that the testimony of these witnesses was not proper background evidence because it had no causal relationship to the conspiracy, the district court did not commit plain error when it allowed their testimony into the record. We note that if Defendant had objected to the testimony of these witnesses, it is likely that the district court would have given a proper limiting instruction, as it did when Defendant objected to Greene's testimony.

Defendant also argues that the district court erred when it sustained the government's hearsay objection when his defense counsel sought to question Mabrey about a beating that the latter received in Chicago after his arrest and about statements that Greene had made to Mabrey. According to Defendant, the district court erred in making these rulings because the testimony being elicited was admissible pursuant to the "co-conspirator exception" to the hearsay rule set forth in Rule 801(d) of the Federal Rules of Evidence. Rule 801(d) provides in pertinent part:

> A statement is not hearsay if —
>
> (2) Admission by party-opponent. The statement is offered against a party and is ... (D) a statement by the party's agent or servant (E) a statement by a coconspirator of a party during the

course of and in furtherance of the conspiracy.

Fed.R.Evid. 801(d)(2). Specifically, a statement is admissible under Fed.R.Evid. 801(d)(2)(E) if it is shown, by a preponderance of the evidence, that the party against whom the statement is offered was a member of the conspiracy, and that the statement was made during and in furtherance of the conspiracy. *United States v. Maliszewski*, 161 F.3d 992, 1011 (6th Cir.1998).

■ In this case, the statements in question were not admissible under Fed. R.Evid. 801(d)(2)(E) because the party against whom the statements were offered (i.e., the government) was not a member of the conspiracy. *Id.* (holding that the defendant could not offer hearsay statements against the government because the government was not a party to the conspiracy); *see also United States v. Mack*, 159 F.3d 208, 215 (6th Cir.1998) (finding that the district court properly refused the defendant's request to introduce the co-conspirator's statements on his own behalf). Further, Defendant failed to show that the statements were made during the conspiracy or were in furtherance of the conspiracy. *Id.*

Nonetheless, Defendant seeks to evade the application of Rule 801(d)(2) by claiming that "there is nothing in the rule which restricts the definition of the word party to the defendant, and there is nothing in the rule or in any Sixth Circuit case located by the Appellant which holds that a defendant who is a party cannot use co-conspirator statements against another party who, at least at one time, was a party to the case." Defendant's Br. at 53. However, contrary to Defendant's claim, this Court in *Maliszewski* held that a co-defendant who pleaded guilty before trial was not a "party" for purposes of admitting a statement of a party under Fed.R.Evid. 801(d)(2)(E). As the government properly argues, the term

"party" should be given the same meaning in both provisions of the same rule. *See Ratzlaf v. United States*, 510 U.S. 135, 143, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994) (noting that the same term should be read the same way). Thus, because the co-defendant witness Mabrey was not a "party" within the meaning of Fed.R.Evid. 801(d)(2)(E), the district court did not abuse its discretion in sustaining the government's objections to defense counsel's line of questioning.

### III.

■ Defendant next raises an *Apprendi* issue, claiming that he should have been sentenced based upon the drug quantity (500 grams) that was determined at trial by the jury beyond a reasonable doubt rather than the 6.8 kilograms found at sentencing by the district court by a preponderance of the evidence. Defendant argues that using the drug quantity determined by the jury beyond a reasonable doubt would have reduced his guidelines range from 262–327 months to 168–210 months. However, as the government points out, *Apprendi* only applies to facts that increase the penalty beyond the statutory maximum; it does not apply to a determination of a sentencing range within the statutory maximum sentence. Moreover, as already noted, in light of *Harris*, —— U.S. at ——, 122 S.Ct. at 2406, *Apprendi* is clearly inapplicable to the instant case inasmuch as Defendant's sentence was not increased beyond the prescribed statutory maximum.

### IV.

■ Next, Defendant argues that the district court erred by using the November 2000 Sentencing Guidelines Manual in sentencing him, rather than pre-November 1997 Sentencing Guidelines Manual. Sentencing under the 1997 manual would have

reduced Defendant's guideline range by two levels because Amendment 555, effective November 1, 1997, increased the base offense level for 6.8 kilograms of methamphetamine from level 34 to level 36. In his Sentencing Memorandum, Defendant contended that there was a "serious issue about whether the defendant had remained a member of the conspiracy after November 1, 1997." Specifically, Defendant argued that the government lacked sufficient evidence to show that he was still "functioning as a member of the Quiroga conspiracy on or after November 1, 1997." At sentencing, the district court rejected Defendant's argument, finding by a preponderance of the evidence that "the defendant was involved in a conspiracy past November 1, 1997." Thus, the district court used the November 2000 Guidelines Manual.

Here, the district court did not err when it used the November 2000 Guidelines Manual to sentence Defendant. Questions regarding the proper application of the sentencing guidelines are reviewed *de novo*. *See United States v. Milton*, 27 F.3d 203, 210 (6th Cir.1994). USSG § 1B1.11 provides in pertinent part:

(a) The court shall use the Guidelines Manual in effect on the date that the defendant is sentenced.

(b) (1) If the court determines that use of the Guidelines Manual in effect on the date that the defendant is sentenced would violate the ex post facto clause of the United States Constitution, the court shall use the Guidelines Manual in effect on the date that the offense of conviction was committed.

In general, a district court must apply the Guidelines in effect at the time of sentencing. *See* 18 U.S.C. § 3553; USSG § 1B1.11(a); *United States v. Taylor*, 286 F.3d 303, 304 n. 2 (6th Cir.2002). But when the Guidelines in effect at the time of sentencing provide for a higher range than those in effect at the time the crime was committed, the court must apply the older version of the Guidelines to avoid an *ex post facto* problem. *See Miller v. Florida*, 482 U.S. 423, 107 S.Ct. 2446, 96 L.Ed.2d 351 (1987); *Milton*, 27 F.3d at 210.

Based upon the trial testimony, the district court did not err in finding that Defendant was involved in the conspiracy after November 1, 1997. Although Defendant contends that the last time he acquired drugs from Quiroga was before November 1, 1997, his ex-girlfriend, Jennifer Stoffel, testified that in October or early November of 1997, Defendant told her that he was getting methamphetamine from Quiroga and selling it to his father and Ted Reinbold. Moreover, during Thanksgiving of 1997, Stoffel was at a party at Defendant's house when Defendant's father stopped by briefly. After his father left, Defendant showed Stoffel about $1,000 that his father had paid him for drugs, which Defendant owed Quiroga. Further, after Mabrey was arrested in January of 1998, Defendant told Stoffel that he was worried about paying Quiroga back because he had spent the money for the Carribean cruise vacation in December of 1997. According to Stoffel, Defendant was still involved in selling drugs in late January of 1998, since he showed her a "softball"-sized quantity of methamphetamine at a hotel in Northville, Michigan. Moreover, according to Defendant's statements to Agent Jones after his arrest, he was getting methamphetamine from Quiroga until late 1997 and early 1998. Accordingly, the district court properly denied Defendant's request to apply the pre-November 1, 1997 Sentencing Guidelines Manu-

al.[1]

## V.

Finally, the district court did not err in denying Defendant's motion to suppress the statements that he made to FBI Special Agent Robert Jones after his arrest because he cannot show that his confession was involuntary.

In reviewing the district court's denial of Defendant's motion to suppress, this Court reviews the district court's findings of fact for clear error and its conclusions of law *de novo*. *United States v. Bradshaw*, 102 F.3d 204, 209 (6th Cir.1996). The applicable standard of review was stated in *United States v. Mahan*, 190 F.3d 416 (6th Cir.1999):

> The district court's conclusions concerning the voluntary nature of an inculpatory statement are reviewed *de novo*. *United States v. Rigsby*, 943 F.2d 631, 635 (6th Cir.1991). When a defendant claims that a confession was coerced, the government bears the burden of proving by a preponderance of the evidence that the confession was in fact voluntary. *United States v. Wrice*, 954 F.2d 406, 410 (6th Cir.1992). This Court has established three requirements for a finding that a confession was involuntary due to police coercion: (i) the police activity was objectively coercive; (ii) the coercion in question was sufficient to overbear the defendant's will; and (iii) the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement. *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir.1988).

*Id.* at 423.

On appeal, Defendant claims that his confession to Agent Jones was involun-

tary, despite the fact that he signed a waiver of rights form, because he was in handcuffs and surrounded by a number of police officers at the time. According to Defendant, he was "confused because of his prior encounter with the FBI in August of 1998 and the threats he believed had been made at that time." Defendant's Br. at 64. Thus, Defendant maintains that because "the coercive nature of the setting and the circumstances satisfies the requirements for involuntariness," the district court erred in refusing to suppress his confession. There is no merit to Defendant's claim.

In this case, there is no evidence that Steven Miller's statements to Agent Jones after his arrest were involuntary as the product of coercive police conduct. "To prove an unconstitutional confession, coercive police activity is a necessary predicate to finding that a confession is not voluntary." *United States v. Gatewood*, 230 F.3d 186, 193 (6th Cir.2000)(*en banc*) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986)) (internal quotation marks omitted). While Defendant was in handcuffs and surrounded by law enforcement officials, he was in the kitchen of his parents' home and allowed to smoke when he was questioned. There is also no indication that Defendant was "confused because of his prior encounter with the FBI in August of 1998," as he contends in his appellate brief. Indeed, in that prior encounter with FBI Special Agent Jones in Kalamazoo, Defendant wasted little time in exercising his *Miranda* rights, refusing to answer any questions without having a lawyer present. In any case, while Defendant claims that he thought that "he had no choice but to

---

1. In any event, the government points out that Defendant was not prejudiced by the use of the November 2000 Sentencing Guidelines

Manual because the guidelines range would have been the same if the November 1, 1997 Sentencing Guidelines Manual had been used.

talk with the FBI" after he was arrested, he testified, in response to the district court's questioning, that he understood his rights at the time he signed the waiver form and that he agreed to talk to the law enforcement officers without a lawyer. Further, Defendant, a high school graduate who had taken approximately two years of college, was no stranger to *Miranda* warnings, having been arrested at least five times before January 7, 2000. Based upon the "totality of the circumstances," it is clear that Defendant cannot show that his waiver of his *Miranda* rights was involuntary as the result of coercive police behavior or that "his will was coercively overborne." *Gatewood*, 230 F.3d at 193. Because Defendant has failed to show that his confession was involuntary, it was properly admitted.

Accordingly, we AFFIRM the district court's judgment convicting Steven Miller of one count of conspiracy to possess with intent to distribute and to distribute methamphetamine, in violation of 21 U.S.C. § 846 and § 841(a)(1) and sentencing him to 262 months' imprisonment, along with a five-year period of supervised release, a fine of $4,820 and a special assessment in the amount of $100.

## CONCLUSION

For the foregoing reasons, we AFFIRM the district court's judgments in both cases.